**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                       No. CR 10-2310 JB

GLORIA E. VIGIL and
ASHLEY GRAY

        Defendants.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on: (i) the Defendant's Objection to the Pre-Sentence Report's Factual Inaccuracies and Offense Level Calculations, filed April 8, 2011 (Doc. 71)("Objections"); and (ii) Defendant Gloria Vigil's Notice of Joining Co-Defendant Ashley Gray's Challenge to the Federal Sentencing Guideline Manual's Marijuana Equivalency for Oxycodone, filed August 17, 2011 (Doc. 102)("Joinder"). The Court held an evidentiary hearing on October 12, 2011. The primary issues are: (i) whether the Court should strike alleged factual inaccuracies from Defendant Ashley Gray's Presentence Investigation Report, disclosed February 2, 2011 ("Gray PSR"); and (ii) whether the Court should downwardly vary on Gray's and Defendant Gloria E. Vigil's sentences based on the lack of a sufficient policy or pharmacological basis for the drug conversion ratio that the United States Sentencing Commission set for oxycodone. The Court will sustain Gray's objections to the references in the Gray PSR regarding her employment at Clinica De La Gloria ("Gloria Clinic"). The Court will remove those portions of the Gray PSR. The Court will not vary on Gray's or Vigil's offense level on the basis that the drug conversion ratio for oxycodone lacks a sound policy rationale, because the Court finds that the drug conversion ratios contained in the guidelines do not create unwarranted sentencing disparities among similarly

situated defendants.

**FINDINGS OF FACT**

Rule 32(i)(3)(B) of the Federal Rules of Criminal Procedure states that courts "must -- for any disputed portion of the presentence report or other controverted matter -- rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B). The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule 32(i)(3)(B). In making these findings, the rules of evidence do not bind the Court. See Fed. R. Evid. 1101(d)(3); United States v. Graham, 413 F.3d 1211, 1221 n.10 (10th Cir. 2005)("In any event, the Federal Rules of Evidence are not applicable to sentencing proceedings.")(citing Fed. R. Evid. 1101(d)(3)). The Court makes the following factual findings:

1.      Marijuana can vary significantly in potency. See Transcript of Hearing at 26:11-14, 28:6-21 (taken October 12, 2011)(Nichols)("Tr.").[1]

2.      When a person takes marijuana, that person's body reacts to that drug based on interactions that drug has with the person's cannabinoid receptors.[2] See Tr. at 26:14-16 (Nichols).[3]

3.      Marijuana is one of the least toxic drugs subject to regulation that people take. See

---

[1]The Court's citations to the transcript of the hearing refers to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

[2]Cannabinoids are "[o]rganic substances present in cannabis sativa, having a variety of pharmacologic properties." Stedman's Medical Dictionary 299 (28th ed. 2006). A receptor is "[a] structure protein molecule on the cell surface or within the cytoplasm that binds to a specific factor, such as a drug, hormone, antigen, or neurotransmitter." Stedman's Medical Dictionary, supra, at 1650.

[3]The United States did not object to the Court allowing Dr. David Nichols to offer expert opinion testimony regarding medical chemistry and pharmacology. See Tr. at 24:15-22 (Loonam, Court, Anderson).

Tr. at 26:16-17 (Nichols).

    4.      Based on marijuana's characteristics, it can be difficult to compare or equate marijuana to other drugs in terms of the level of physical harm a particular drug causes.  See Tr. at 26:25-27:15 (Nichols).

    5.      When the Sentencing Commission adopted an amendment making marijuana the only drug to which other drugs are converted for sentencing purposes, the Commission provided the following explanation for the amendment:

> In addition, the amendment simplifies the application of the Drug Equivalency Table by referencing the conversions to one substance (marihuana) rather than to four substances; the use of one referent rather than four makes no substantive change but will make the required computations easier and reduce the likelihood of computational error.

U.S. Sentencing Manual app. C, vol. I, at 276 (2003).

    6.      People who work in the field of pharmacology use drug equivalency formulas for some purposes, such as comparing the potency of opiates.[4]  See Tr. at 27:14-24 (Nichols).

    7.      Heroin and other opiates have a much higher level of toxicity[5] than marijuana.  See Tr. at 29:7-30:8 (Nichols, Loonam).

    8.      Opiates taken through injection, such as heroin, have a higher rate of overdose causing death than opiates taken in pill form, because a drug absorbs more quickly when taken intravenously.  See Tr. at 33:12-34:3 (Loonam, Nichols); id. at 38:2-13 (Nichols).

    9.      The following chart demonstrates the dosage of different opiates needed for each of

---

[4]An opiate is "[a]ny preparation or derivative of opium."  Stedman's Medical Dictionary, supra, at 1374.  Opium is a drug "[u]sed as an analgesic, hypnotic, and diaphoretic, and for diarrhea and spasmodic conditions."  Stedman's Medical Dictionary, supra, at 1374.

[5]Toxicity is "[t]he state of being poisonous."  Stedman's Medical Dictionary, supra, at 2003.

those drugs to cause the same amount of pain relief, in other words an equianalgesic[6] dose:

### Equivalency Table Sorted by Equianalgesic Doses (Column 4)

| Schedule I or II Drug | Amount | Marijuana Equivalency | Equianalgesic Oral Dose |
|---|---|---|---|
| 3-methylfentanyl | 1 g | 10,000 g | 0.003 mg |
| Fentanyl | 1 g | 2,500 g | 0.01 mg |
| Alpha-methylfentanyl | 1 g | 10,000 g | 0.5 mg |
| Dextromoramide | 1 g | 670 g | 1.2 mg |
| Levorphanol | 1 g | 2,500 g | 4 mg |
| PEPAP | 1 g | 700 g | 5 mg |
| Dipipanone | 1 g | 250 g | 6 mg |
| Hydromorphone | 1 g | 2,500 g | 7.5 mg |
| Racemorphan | 1 g | 800 g | 8 mg |
| Monoacetylmorphine | 1 g | 1,000 g | 15 mg |
| Heroin | 1 g | 1,000 g | 15 mg |
| Ethylmorphine | 1 g | 165 g | 17 mg |
| Methadone | 1 g | 500 g | 20 mg |
| Morphine | 1 g | 500 g | 30 mg |
| Hydrocodone | 1 g | 500 g | 30 mg |
| Oxycodone | 1 g | 6,700 g | 30 mg |
| MPPP | 1 g | 700 g | 43 mg |
| Alphaprodine | 1 g | 100 g | 120 mg |
| Dextropropoxyphene | 1 g | 50 g | 130 mg |
| Codeine | 1 g | 80 g | 130 mg |
| Meperidine | 1 g | 50 g | 300 mg |

Most dosages taken from Table 21-6, p 581 in Goodman and Gilman's, 11th Edition, p 580.

Equivalency Table Sorted by Equianalgesic Doses, filed October 12, 2011 (Defendant's Exhibit A)("Equivalency Table").

10.     A person would need to take 30 milligrams ("mg") of oxycodone[7] as opposed to 15 mg of heroin to have an equianalgesic does of that drug.  See Equivalency Table; Tr. at 32:15-33:4 (Loonam, Nichols):

11.     In comparison, the sentencing guidelines equate one gram of heroin to 1,000 grams of marijuana, and one gram of oxycodone to 6,700 grams of marijuana.  See Equivalency Table; U.S.S.G. § 2D1.1 cmt. n.10(D).

12.     An equianalgesic dose of codeine[8] and oxycodone would require 130 mg of codeine and 30 mg of oxycodone.  See Equivalency Table.

13.     In comparison, the sentencing guidelines equate one gram of codeine with 80 grams of marijuana, and one gram of oxycodone to 6,700 grams of marijuana.  See Equivalency Table; U.S.S.G. § 2D1.1 cmt. n.10(D).

14.     An equianalgesic dose of morphine and oxycodone would require 30 mg of morphine and 30 mg of oxycodone.  See Equivalency Table.

_____

[6]Analgesic means "[a] compound capable of producing analgesia, i.e., one that relieves pain by altering the perception of nociceptive stimuli without producing anesthesia or loss of consciousness."  Stedman's Medical Dictionary, supra, at 71.  Nociceptive means "[c]apable of appreciation or transmission of pain."  Stedman's Medical Dictionary, supra, at 1323.

[7]Oxycodone is a "narcotic analgesic often prepared with aspirin or acetaminophen."  Stedman's Medical Dictionary, supra, at 1400.  A narcotic is "any drug derived from opium or opiumlike compounds with potent analgesic effects associated with both significant alteration of mood and behavior and with potential for dependence and tolerance."  Stedman's Medical Dictionary, supra, at 1281.

[8]Codeine is an "alkaloid obtained from opium . . . but usually made from morphine." Stedman's Medical Dictionary, supra, at 404.

-5-

15.    In comparison, the sentencing guidelines equate one gram of morphine with 500 grams of marijuana, and one gram of oxycodone to 6,700 grams of marijuana.  See Equivalency Table; U.S.S.G. § 2D1.1 cmt. n.10(D).

16.    The following graph compares the equianalgesic doses of various opiates (on the x-axis) in relation to their marijuana equivalency ratio (on the y-axis):

**Comparison of Effective Doses of Opiate Analgesics with Marihuana Equivalencies**



Comparison of Effective Doses of Opiate Analgesics with Marihuana Equivalencies (Defendant's Exhibit B)("Equivalency Graph").

17.    Compared to other opiates, oxycodone and morphine interact in a similar manner with and have similar effects on the human body.  See F. Coluzzi & C. Mattia, Oxycodone: Pharmacological Profile and Clinical Data in Chronic Pain Management, Minerva Anestesiol Vo. 71, at 457-459 (2005).

-6-

18.     The sentencing guidelines determine the amount of oxycodone for drug equivalency purposes by looking at "the weight of the controlled substance, itself, contained in the pill, capsule, or mixture." U.S.S.G. § 2D1.1(c) n.(B).

19.     In comparison, the sentencing guidelines determine the amount of heroin, codeine, and morphine for drug equivalency purposes based on the entire weight of the mixture or substance. See U.S.S.G. § 2D1.1(c) n.(A) & cmt. n.1.

20.     In the years between 1981 and 2003, a government study concluded that the average purity of heroin ranged from nine-percent purity to forty-percent purity. See Office of Nat'l Drug Control Policy, Executive Office of the President, The Price and Purity of Illicit Drugs: 1981 Through the Second Quarter of 2003 at 74 (2004), available at www.ncjrs.gov/ondcppubs/publications/pdf/price_purity.pdf.

21.     That same government study indicated that the average purity of heroin tended to increase each year. See id. at 74, 80.

22.     The purity of a sample of heroin tends to increase when the seized amount of heroin increases, such as 200 grams as opposed to 10 grams. See id. at 80.

23.     Heroin can range from five percent to 100 percent purity. See Tr. at 37:10 (Nichols).

24.     As of November 1987, one gram of oxycodone was equivalent to .5 grams of heroin for sentencing guidelines purposes. See 52 Fed. Reg. 44,674, 44,694 (Nov. 20, 1987).

25.     In 2002, oxycodone was equivalent to 500 grams of marijuana. See U.S. Sentencing Guidelines Manual § 2D1.1 Drug Equivalency Table (2002).

26.     Before 2003, courts measured the entire weight of the mixture or substance containing the oxycodone when determining the amount for sentencing purposes. See U.S. Sentencing Guidelines Manual § 2D1.1 cmt. n.(A) (2002).

27.     In 2003, the Sentencing Commission increased the marijuana equivalency ratio for oxycodone to 6700 grams.  See U.S. Sentencing Guidelines Manual § 2D1.1 Drug Equivalency Table (2003).

28.     In 2003, the sentencing guidelines began measuring the amount of oxycodone based on the actual weight of the drug as opposed to the total weight of the mixture or substance.  See U.S. Sentencing Guidelines Manual § 2D1.1 cmt. n.(B) (2003).

29.     In the minutes for the March 26, 2003 Sentencing Commission meeting where this amendment was approved, the Sentencing Commission's general counsel, Charles Tetzlaff, stated that the proposed amendment responds to proportionality issues in the sentencing of oxycodone trafficking.  See U.S. Sentencing Comm'n, Minutes of the March 26, 2003 U.S. Sentencing Commission Public Meeting at 4 (Government's Exhibit 2), available at http://www.ussc.gov/Legislative_and_Public_Affairs/Public_Hearings_and_Meetings/20030325 -26/3_26_03.htm [hereinafter March 26, 2003 Minutes].

30.     The minutes of the March 26, 2003 provide two proportionality issues: (i) differing formulations for different medicines containing oxycodone; and (ii) different amounts of oxycodone found in pills of identical weight.  See March 26, 2003 Minutes at 4.

31.     The minutes of the March 26, 2003 indicate that the proposal sought to remedy these proportionality issues by calculating the weight of the actual oxycodone instead of applying the current method of calculating the weight of the entire pill.  See March 26, 2003 Minutes at 4.

32.     The March 26, 2003 Minutes note that the proposed change would keep penalties for offenses involving ten mg of OxyContin[9] identical to current levels, but would increase penalties

---

[9]OxyContin is a brand-name version of oxycodone.  See Oxycodone, Wikipedia, http://en.wikipedia.org/wiki/Oxycodone (last visited Dec. 19, 2011).  It is taken orally as a pill and

for all other doses of OxyContin.  See March 26, 2003 Minutes at 4.

33.    The March 26, 2003 Minutes indicated, on the other hand, that the proposed change

would significantly reduce the penalties for Percocet, a brand name drug that contains oxycodone.

See March 26, 2003 Minutes at 4.

34.    Chair of the Sentencing Commission, Diana E. Murphy, noted that Congress would

be particularly interested in this amendment, because the illicit drug market for oxycodone has

grown.  See March 26, 2003 Minutes at 4.

35.    Vice Chair John R. Steer indicated that he was pleased with this proposed

amendment, because he believed it was a rational approach to focus on the controlled substance

itself and provide for proportional guideline penalties based on the amount of the controlled

substance, as opposed to the way the substance is synthesized or formulated.  See March 26, 2003

Minutes at 4.

36.    Steer noted that the Department of Justice supports the proposed approach even

though it lowers the punishment for Percocet trafficking offenses.  See March 26, 2003 Minutes at

4.

37.    The ex officio commissioner, Eric H. Jaso, noted that the proposed amendment brings

proportionality by basing oxycodone penalties on the amount of the active ingredient rather than the

delivery substance.  See March 26, 2003 Minutes at 5.

38.    Jaso stated that the Drug Enforcement Administration ("DEA") would continue to

investigate and prosecute these crimes, as they frequently involve medical professionals who abuse

their authority and violate the public trust by making these substances available for non-medical

───────────────

is a time-release version of oxycodone.  See id.

purposes.  See March 26, 2003 Minutes at 5.

39.     Jaso asserted that the Department of Justice will continue to monitor this issue and will bring to the Sentencing Commission's attention any unintended effects resulting from the proposed amendment.  See March 26, 2003 Minutes at 5.

40.     When the 2003 version of the United States Sentencing Guideline Manual adopted this amendment discussed at this March 26, 2003 meeting, the Sentencing Commission provided the following reason for the amendment:

> This amendment responds to proportionality issues in the sentencing of oxycodone trafficking offenses.  Oxycodone is an opium alkaloid found in certain prescription pain relievers such as Percocet and OxyContin.  This prescription drug generally is sold in pill form and, prior to this amendment, the sentencing guidelines established penalties for oxycodone trafficking based on the entire weight of the pill.  The proportionality issues arise (1) because of the formulations of the different medicines; and (2) because different amounts of oxycodone are found in pills of identical weight.
>
> As an example of the first issue, the drug Percocet contains, in addition to oxycodone, the non-prescription pain reliever acetaminophen.[10]  The weight of the oxycodone component accounts for a very small proportion of the total weight of the pill.  In contrast, the weight of the oxycodone accounts for a substantially greater proportion of the weight of an OxyContin pill.  To illustrate this difference, a Percocet pill containing five milligrams (mg) of oxycodone weighs approximately 550 mg with oxycodone accounting for 0.9 percent of the total weight of the pill.  By comparison, the weight of an OxyContin pill containing 10 mg of oxycodone is approximately 135 mg with oxycodone accounting for 7.4 percent of the total weight.  Consequently, prior to this amendment, trafficking 364 Percocet pills or 1,481 OxyContin pills resulted in the same five year sentence of imprisonment.  Additionally, the total amount of the narcotic oxycodone involved in this example is vastly different depending on the drug.  The 364 Percocets produce 1.8 grams of actual oxycodone while the 1,481 OxyContin pills produce 14.8 grams of oxycodone.
>
> The second issue results from differences in the formulation of OxyContin.

---

[10]Acetaminophen is "[a]n antipyretic and analgesic, with potency similar to that of aspirin." Stedman's Medical Dictionary, supra, at 11.  An antipyretic is used for reducing fever.  See Stedman's Medical Dictionary, supra, at 111.

Three different amounts of oxycodone (10, 20, and 40 mg) are contained in pills of identical weight (135 mg). As a result, prior to this amendment, an individual trafficking in a particular number of OxyContin pills would receive the same sentence regardless of the amount of oxycodone contained in the pills.

To remedy these proportionality issues, the amendment changes the Drug Equivalency Tables in §2D1.1 (Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses); Attempt or Conspiracy) to provide sentences for oxycodone offenses using the weight of the actual oxycodone instead of calculating the weight of the entire pill. The amendment equates 1 gram of actual oxycodone to 6,700 grams of marihuana. This equivalency keeps penalties for offenses involving 10 mg OxyContin pills identical to levels that existed prior to the amendment, substantially increases penalties for all other doses of OxyContin, and decreases somewhat the penalties for offenses involving Percocet.

U.S. Sentencing Manual app. C, vol. II, at 387-88 (2003).

41.     Drug companies manufacture oxycodone, and a person must have a prescription to obtain oxycodone legally. See Tr. at 48:7-15 (Loonam, Nichols).

42.     Private citizens rarely manufacture oxycodone privately in a recreational manner. See Tr. at 48:7-15 (Loonam, Nichols).

43.     Profits from heroin sales are sometimes used to finance terrorist organizations internationally. See Rachel Ehrenfeld, Stop the Afghan Drug Trade, Stop Terrorism, Forbes, Feb. 26, 2009, available at http://www.forbes.com/2009/02/26/drug-trade-afghanistan-opinions-contributors_terrorism_mycoherbicides.html.

44.     In 2009, OxyContin, a form of oxycodone, was the fifteenth highest profiting prescription drug in the United States. See Patricia Van Arnum, U.S. Prescription-Drug Market Rebounds, PharmTech.com (Apr. 7, 2010), http://pharmtech.findpharma.com/pharmtech/US-Prescription-Drug-Market-Rebounds/ArticleStandard/Article/detail/664150.

45.     Following its introduction in December 1995, OxyContin's sales reached one billion dollars. See Barry Meier & Melody Petersen, Sales of Painkiller Grew Rapidly, But Success

Brought   a   High   Cost,   N.Y.   Times   (Mar.   5,   2011),
http://www.nytimes.com/2001/03/05/business/sales-of-painkiller-grew-rapidly-but-success-brou
ght-a-high-cost.html?pagewanted=all&src=pm.

46.    The producer of OxyContin heavily encouraged doctors to sell OxyContin.  See id.

47.    A DEA official stated that no other prescription drug in the last 20 years had been
illegally abused by so many people following its appearance on the market.  See id.

48.    Not all doctors who prescribed OxyContin had familiarity with prescribing powerful
narcotics, which can make it more difficult to identify individuals who seek to abuse those drugs.
See id.

49.    In spite of OxyContin regulation, abuse of the drug has hit high levels.  See id.

50.    In 2007, Purdue Pharma -- the maker of OxyContin -- agreed to pay $600 million in
fines to federal officials to resolve criminal and civil proceedings arising out drug misbranding
charges.  See Barry Meier, In Guilty Plea, OxyContin Maker to Pay $600 Million, N.Y. Times (May
10, 2007), http://www.nytimes.com/2007/05/10/business/11drug-web.html?pagewanted=all.

51.    Some executives and a high-level attorney working for Purdue Pharma also pled
guilty to criminal violations, and paid a total of $34.5 million in fines.  See id.

52.    The same company who manufactures OxyContin also manufactures MS Contin.[11]
See Art Van Zee, The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health
Tragedy, Health Policy and Ethics Vol. 99, No.2, at 225 (Feb. 2009).

53.    Purdue Pharma spent roughly six to twelve times the amount to market and promote
OxyContin as it did to promote MS Contin.  See id.

---

[11]MS Contin is a form of oral morphine.  See Morphine Oral, PubMedHealth (last updated
June 15, 2011), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000590/.

54.     In 2004, there were 214,432 drug related visits to emergency rooms for heroin, 41,701 for oxycodone, and 13,966 for morphine.  See Office of Applied Studies, U.S. Dep't of Health and Human Servs., Drug Abuse Warning Network, 2004: Selected Tables of National Estimates of Drug-Related Emergency Department Visits 4, 14 (2006), available at https://dawninfo.samhsa.gov/files/ED2004/2004EDTables.pdf.

55.     The United States and Gray agreed that she is responsible for 3.6 grams of oxycodone.  See Gray PSR ¶ 44, at 13.

56.     That amount of oxycodone converts to 24.12 kilograms of marijuana under the current sentencing guidelines.  See U.S.S.G. § 2D1.1 cmt. n.10(D); Gray PSR ¶ 44, at 13.

57.     The United States and Gray's stipulation as to the amount of oxycodone arises from her possession of eighty pills of 30 mg oxycodone pills[12] and 120 pills containing 10 mg of Percocet that weighed 335 mg per pill.  See Gray PSR ¶¶ 13, 22, at 5; Objections at 3; United States' Response to Defendant Ashley Gray's Objections to the Pre-Sentence Report at 7 n.4, filed May 6, 2011 (Doc. 81)("Response").

58.     The United States and Vigil agreed that, under the current sentencing guidelines, she is responsible for the equivalent of at least 700 kilograms but less than 1,000 kilograms of marijuana pursuant to the amount of oxycodone in her possession.  See Presentence Investigation Report ¶ 46, at 14, disclosed July 7, 2011 ("Vigil PSR").

59.     Applying the 6700 grams of marijuana to one gram of oxycodone drug equivalency ratio, 700 kilograms of marijuana would equal 104.48 grams of actual oxycodone.  See U.S.S.G. § 2D1.1 cmt. n.10(D).

---

[12]The Court assumes that the total weight of the 30 mg oxycodone pills is 30 mg, as the PSR's do not provide any additional details regarding the total weight of these pills.

60.     Applying the 6700 grams of marijuana to one gram of oxycodone drug equivalency ratio, 1,000 kilograms of marijuana would equal 149.25 grams of actual oxycodone.  See U.S.S.G. § 2D1.1 cmt. n.10(D).

61.     The investigation did not reveal the exact amount of illegitimate prescriptions Vigil authored.  See Vigil PSR ¶¶ 39-40, at 12-13.

62.     Vigil was authoring prescriptions for 30 mg oxycodone pills and Percocet pills, including pills containing 10 mg of Percocet that weighed 335 mg per pill.  See Vigil PSR ¶¶ 15-16, 20, 22, 26, 31, 34, 36, 38, at 6-12

## PROCEDURAL BACKGROUND

The United States Probation Office ("USPO") disclosed the Vigil PSR on July 7, 2011.  In the Vigil PSR, the USPO calculates Vigil's total offense level to be 31.  See Vigil PSR ¶ 54, at 15.  The USPO calculates a base offense level of 30 based on the drug equivalency tables contained in U.S.S.G. § 2D1.1 and the parties' agreement that "the equivalent of at least 700 kilograms but less than 1,000 kilograms of marijuana is attributable to the defendant."  Vigil PSR ¶ 46, at 14.  The Vigil PSR includes a 2-level upward adjustment under U.S.S.G. § 3B1.1(c) based on Vigil's status as an "organizer, leader, manager, or supervisor" in the criminal activity at issue.  Vigil PSR ¶ 47, at 14.  The Vigil PSR includes a 2-level upward adjustment under U.S.S.G. § 3B1.3(c) based on Vigil abusing a position of trust during the commission of her offense.  See Vigil PSR ¶ 50, at 14-15.  The Vigil PSR includes a 3-level reduction under U.S.S.G. § 3E1.1 based on Vigil's acceptance of responsibility.  See Vigil PSR ¶ 53, at 15.  The Vigil PSR lists her criminal history category as I, based on 0 criminal history points.  See Vigil PSR ¶ 57, at 16.  The Vigil PSR calculates that an offense level of 31 and a criminal history category of I results in a guideline imprisonment range of 108 to 135 months.  See Vigil PSR ¶ 102, at 25.

The USPO disclosed the Gray PSR on February 2, 2011.  In the Gray PSR, the USPO calculates Gray's total offense level to be 13.  See Gray PSR ¶ 51, at 14.  The Gray PSR calculates a base offense level of 18 under U.S.S.G. § 2D1.1 based on the stipulation that she is responsible for 3.6 grams of actual oxycodone.  See Gray PSR ¶ 44, at 13.  The Gray PSR includes a 2-level reduction on Gray's offense level under U.S.S.G. § 3B1.2 based on the parties' stipulation that she was a minor participant in the criminal activity.  See Gray PSR ¶ 47, at 13-14.  The Gray PSR includes a 3-level reduction under U.S.S.G. § 3E1.1 based on Gray's acceptance of responsibility. See Gray PSR ¶ 50, at 14.  The Gray PSR lists her criminal history category as II, based on 3 criminal history points.  See Gray PSR ¶ 57, at 16.  The Gray PSR calculates that an offense level of 13 and a criminal history category of II results in a guideline imprisonment range of 15 to 21 months.  See Gray PSR ¶ 99, at 26.

On April 8, 2011, Gray filed her Objections.  First, she requests that the Court strike alleged factual inaccuracies from the Gray PSR that describe her as an employee of the Gloria Clinic.  See Objections at 3-5.  She contends that she was Vigil's patient, and that she never received any compensation from Vigil or any of the proceeds from any prescriptions that Vigil sold.  See Objections at 4.  She asserts that "[a]t no time did [she] have any financial interest in any aspect of the operation of Ms. Vigil's practice or that of the Clinic."  Objections at 4.  Thus, she asserts, the stipulation to her role as a minor participant in the criminal activity is proper.  See Objections at 4-5.

Second, Gray contends that the Court should vary downward on her offense level based on the inaccurate marijuana equivalency ratio for oxycodone contained in the sentencing guidelines. See Objections at 5.  She argues that the chosen equivalency ratio is unreasonable, lacks evidentiary support, and creates unfair sentencing disparities for similar conduct.  See Objections at 5. Specifically, Gray asserts that "[a] comparison of oxycodone offense levels with offense levels for

-15-

offenses involving different but very similar substances shows a great disparity in offense level calculation that result from vastly different marihuana equivalency ratios applied to similar substances." Objections at 5. She analogizes oxycodone to heroin, morphine, and codeine based on those drugs' properties. See Objections at 5. She argues that, had she "transferred an equal amount of heroin as she has oxycodone in this case[,] her offense level would be 12." Objections at 5. Similarly, she notes that, if she had transferred an equal amount of morphine, her offense level would be 10, and would have been 6 if she had transported an equal amount of codeine. See Objections at 5. She contends that heroin has far greater negative social impacts than oxycodone. See Objections at 6. She notes that the Supreme Court of the United States "has held that where a particular Guideline is not based on empirical evidence, it is not an abuse of discretion for a district court to impose an outside-of-Guidelines sentence based solely on broad policy concerns." Objections at 6 (citing Kimbrough v. United States, 552 U.S. 85, 108-10 (2007)). She contends that the Court's failure to grant a variance would "result in a grave injustice, continuing unfair sentencing disparities between controlled substance offenders that are not based on any factual data and are inconsistent with the data that is known about the controlled substance the offenses involve." Objections at 7. Gray recounts the history of the drug oxycodone. See Objections at 8-9. She then recites the history of oxycodone's equivalency ratio under the sentencing guidelines. See Objections at 9-13. She notes that, originally, one gram of oxycodone was equivalent to .5 grams of heroin, or 500 grams of marijuana, under the guidelines. See Objections at 10-11. She asserts that, based on a 2003 amendment to the sentencing guidelines, one gram of oxycodone became equivalent to 6700 grams of marijuana. See Objections at 11. She contends that the Sentencing Commission did not provide much support for its rationale underlying the changes it made to these equivalency ratios. See Objections at 10-12. She notes that oxycodone abuse has risen significantly in recent years.

-16-

See Objections at 12-13.  Gray argues that, based on the chemical similarity between various opiate drugs and the similarity between the effects that they have on society, the Sentencing Commission's decision to provide a higher drug equivalency ratio for oxycodone is unfounded.  See Objections at 13-15.

On May 6, 2011, the United States filed its Response to Gray's Objections.  First, the United States agrees that neither Vigil nor the Gloria Clinic employed Gray "in the traditional sense." Response at 2.  Second, the United States does not contest that a district court has discretion to impose a sentence outside the advisory guideline range.  See Response at 3-4.  The United States asserts that, while the Sentencing Commission "increased the marijuana equivalency for oxycodone to 6700 to 1" in November 2003, courts now consider "only the actual amount of the oxycodone" as opposed to total weight of the drug.  Response at 4-5.  The United States contends that this "amendment was designed to address proportionality issues stemming from differences in total pill size compared to an amount of actual oxycodone."  Response at 4-5.  It notes that this "amendment served to reduce sentences for larger tablets containing comparatively smaller amounts of oxycodone, while increasing sentences for smaller tablets containing a higher concentration of the actual drug."  Response at 5.  It asserts that, "[t]o arrive at the 6700 to 1 ratio, the Sentencing Commission simply maintained the penalty for a 10 milligram OxyContin pill having a total weight of 135 grams."  Response at 5.  The United States contends that Gray's arguments analogizing her offense level based on weight to other opiates misconstrue how this amendment changed the calculation of drug equivalency for oxycodone.  See Response at 6.  For example, it asserts that, "[w]hile it is true that the same 3.6 grams of heroin or morphine would have resulted in a lower guideline range, it is unlikely that such heroin or morphine would have been distributed in pure form."  Response at 6.  The United States notes that, instead, "Gray would have been liable for the

entire weight of the mixture and substance in addition to the actual heroin." Response at 6. The United States argues that the new oxycodone "ratio does not materially increase the punishment associated with oxycodone offenses," as "the amendment simply changes the focus from the weight of mixture and substance to that of the actual drug." Response at 6. It elaborates that, "[w]hile the new ratio certainly represents an increase in punishment for tablets containing high concentrations of oxycodone, . . . the Commission itself notes in Amendment 657" that "the new ratio actually decreases the punishment associated with pills containing a lower concentration of oxycodone relative to total weight." Response at 6-7. The United States contends that, even if the Court were to apply the old oxycodone ratio of 500 to 1, it "would result in the same base offense level of 18 as obtained under the current 6700 to 1 (actual) ratio." Response at 7. It asserts that "[w]hat Defendant is really asking for . . . is the best of both worlds; a hybrid approach combining both the old 500 to 1 equivalency ratio and the current guideline's consideration of only the amount of actual oxycodone." Response at 7-8. The United States further contends that the oxycodone ratio is independently justifiable. See Response at 8. The United States argues that, "[w]hile there is likely some truth to the idea that the availability of oxycodone has increased as a result of marketing efforts, that reality does not mean that the public health concerns related to oxycodone are in any way imaginary." Response at 8. It asserts that "the public health concerns and societal dangers attendant to prescription drug abuse are quite real." Response at 8. It asserts that the rates of addiction to oxycodone and the number of deaths associated with oxycodone overdoes are increasing every year. See Response at 9.

On June 24, 2011, the USPO disclosed an Addendum to the PSR to address Gray's objections. Regarding Gray's first objection, the Addendum notes that, while "the defendant was not a legitimate employee, meaning being on the Gloria Clinic's payroll, she was indeed working

for Gloria Vigil by running errands and selling prescriptions for her." Addendum at 1. Regarding Gray's second objection, the Addendum notes that Gray did not distribute any of the other drugs she addresses in her Objections, so those drug equivalency ratios would not apply. See Addendum at 2. It reiterates that "a base offense level of 18 reflects the seriousness of the offense and adequately reflects her criminal conduct." Addendum at 2. On August 17, 2011, Vigil joined Gray's Objections regarding a variance under the guideline based on the oxycodone equivalency ratio. See Joinder at 1-2.

At the evidentiary hearing on October 12, 2011, the Defendants clarified that they are seeking a variance rather than a departure. See Tr. at 3:15-4:11 (Anderson, Court, Lowry, Loonam). The Defendants argued that the concept of relying on marijuana as a common currency for drug conversion purposes improperly takes the pharmacological characteristics of many different substances and attempts to reduce them to a common unit. See Tr. at 5:8-7:5 (Loonam). The Defendants contend that the Sentencing Commission improperly singled out oxycodone and made its equivalency ratio higher. See Tr. at 7:6-22 (Loonam). The Court inquired whether some younger people in more affluent parts of the Albuquerque, New Mexico area are starting on oxycodone and then moving to heroin. See Tr. at 8:5-9:10 (Court). The Defendants argued that, at least at a broader level, oxycodone is more likely a drug that lower income people take. See Tr. at 10:3-14 (Loonam). The Defendants emphasized that pharmaceutical companies have aggressively pushed oxycodone. See Tr. at 11:11-23 (Loonam). The Defendants recognized that the situation created by this alleged disparity in the oxycodone equivalency ratio is different in some ways than the situation presented in Kimbrough v. United States. See Tr. at 12:18-14:19 (Loonam). The Defendants contended that the Sentencing Commission made the punishment more stringent for oxycodone without any legitimate basis for doing so. See Tr. at 13:18-16:6 (Loonam). The Court inquired whether, in a

-19-

situation where a new designer drug becomes popular among young people, the Sentencing Commission could properly change the drug equivalency ratio in order to reach higher offense levels for offenses involving that drug.  See Tr. at 16:7-14 (Court).  The Defendants agreed that such a decision would be proper, but contended that the Sentencing Commission should make some finding to that effect or otherwise explain its rationale.  See Tr. at 16:15-17:10 (Loonam, Court).

Following the presentation of evidence, the Court inquired whether the Defendants had proved too much in that they had established that drug equivalency ratios relying on marijuana as a common currency are improper, but, because the whole system is flawed, a court cannot rely on those flaws to justify a variance in a given case.  See Tr. at 73:13-18 (Court).  The Defendants contended that there is more specific evidence to indicate that the drug equivalency ratio for oxycodone is arbitrary and capricious.  See Tr. at 74:6-20 (Loonam).  The Court inquired whether the Sentencing Commission chose marijuana to create a baseline comparison, because it is widely considered the lowest level drug under federal law and in society.  See Tr. at 74:24-75:18 (Court). The Defendants reiterated that the goal for sentencing should be to determine the risk and harm of different substances based on their pharmacological characteristics.  See Tr. at 78:8-14 (Loonam). The Court inquired whether a pharmacological analysis of dangerousness contains some degree of subjectivity.  See Tr. at 78:15-79:1 (Court).  The Defendants argued that a pharmacological analysis of dangerousness focuses on potency, likelihood of death, and the means through which the drug enters the body.  See Tr. at 79:2-7 (Loonam).  The Defendants contended that the United States bears the burden to show an empirical basis for a guideline.  See Tr. at 85:12-24 (Loonam).  The Defendants requested that the Court should put aside the guidelines and come up with a different sentence for them.  See Tr. at 87:4-22 (Court, Loonam).  The United States asserts that the minutes for the March 26, 2003 Sentencing Commission meeting indicate that the Sentencing Commission

was attempting to address broader societal harms, such as the growing market for oxycodone, when adopting the current drug equivalency ratio for oxycodone. See Tr. at 91:12-18 (Anderson). It noted that it is within the Sentencing Commission's power and a proper exercise of their position to consider broader societal dangers, some of which cannot be measured objectively. See Tr. at 91:18-92:13 (Anderson). The Defendants asserted that they did not have the expectation that the Court would disregard the basic structure of the guidelines in their entirety. See Tr. at 105:19-106:1 (Loonam). The United States asked the Court to consider that its decision in this case would likely impact all oxycodone cases that come before the Court in the future. See Tr. at 112:13-19 (Anderson).

## LAW REGARDING THE UNITED STATES SENTENCING COMMISSION

The Supreme Court in Rita v. United States, 551 U.S. 338 (2007), described the method generally employed in developing the guidelines, stating that the guidelines were developed based on the Sentencing Commission's study of empirical evidence. See Rita v. United States, 551 U.S. at 348.

> Rather than choose among differing practical and philosophical objectives, the Commission took an 'empirical approach,' beginning with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past and then modifying and adjusting past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.

Rita v. United States, 551 U.S. at 349. The Supreme Court recognized, however, that "[t]he Commission's work is ongoing," and that the "statutes and the Guidelines themselves foresee continuous evolution helped by the sentencing courts and the courts of appeals in that process." Rita v. United States, 551 U.S. at 349.

> The sentencing courts, applying the Guidelines in individual cases may depart (either pursuant to the Guidelines or, since Booker, by imposing a non-Guidelines sentence). The judges will set forth their reasons. The Courts of Appeals will determine the

> reasonableness of the resulting sentence. The Commission will collect and examine
> the results. In doing so, it may obtain advice from prosecutors, defenders, law
> enforcement groups, civil liberties associations, experts in penology, and others.
> And it can revise the Guidelines accordingly.

Rita v. United States, 551 U.S. at 350. In 2007, the Supreme Court reiterated that the guidelines

were generally a product of careful study based on extensive empirical evidence derived from the

review of thousands of individual sentencing decisions. See Gall v. United States, 522 U.S. 38, 46

(2007). The Supreme Court recognized, however, that "not all of the Guidelines are tied to this

empirical evidence." Gall v. United States, 522 U.S. at 46 n.2. The Supreme Court has recognized

that, "[e]ntrusted within its sphere to make policy judgments, the Commission may abandon its old

methods in favor of what it has deemed a more desirable 'approach,'" for example in changing the

method by which it "calculat[es] LSD quantities." Kimbrough v. United States, 552 U.S. at 104

(quoting Neal v. United States, 516 U.S. 284, 295 (1996)).

## LAW REGARDING SENTENCING GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court severed the mandatory

provisions from Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1987 (codified as

amended in scattered sections of 18 U.S.C.), thus making the sentencing guidelines effectively

advisory. While excising two sections, the Supreme Court left the remainder of the Act intact,

including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that

guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in

determining whether a sentence is unreasonable." United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than

necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and
>        to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2)(A)-(D).  Under 18 U.S.C. § 3551:

[A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551.  To achieve these purposes, 18 U.S.C. § 3553(a) directs sentencing courts to consider: (i) the guidelines; (ii) the nature of the offense and the defendant's character; (iii) the available sentences; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the guidelines are no longer mandatory, both the Supreme Court and the United States Court of Appeals for the Tenth Circuit have clarified that district courts must always consider the guidelines even though they are one of several factors enumerated in 18 U.S.C. § 3553(a).  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)("[A]lthough the Guidelines are listed as only one of the § 3553(a) factors, they are not just one factor among many."), overruled on other grounds by Gall v. United States, 552 U.S. 38 (2007).  They are significant, because "the Guidelines are an expression of popular political will about sentencing that

-23-

is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses." United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted).  A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable." United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006).  This presumption, however, is an appellate presumption, and not one that the trial court can or should apply.  See Gall v. United States, 552 U.S. at 40; Kimbrough v. United States, 552 U.S. at 91; Rita v. United States, 551 U.S. at 347-48.  Instead, the trial court must undertake the § 3553(a)  balancing of factors without any presumption in favor of the advisory guideline sentence. See Gall v. United States, 552 U.S. at 40; Kimbrough v. United States, 552 U.S. at 91; Rita v. United States, 551 U.S. at 347-48; United States v. Hernandez,  No. 03-2451, 2008 WL 4820800, at *4 (D.N.M. June 30, 2008)(Browning, J.).

## ANALYSIS

Because the parties have agreed that Gray was not a Gloria Clinic employee, the Court will sustain Gray's objection to those portions of the Gray PSR indicating that she was an employee. While the Court recognizes there may be some flaws in relying on marijuana as a common currency for drug equivalency ratios, the Court does not find those flaws significant enough to discard the drug equivalency scheme within the guidelines.  The Court will not vary downward on Gray or Vigil's offense level on the basis that the drug conversion ratio for oxycodone lacks a sound policy rationale.  The Court does not adopt their argument that oxycodone has an arbitrary or unreasonably high drug equivalency ratio compared to other opiates as applied to their case.  Although the

Sentencing Commission may have chosen to punish oxycodone more in line with other opiates, the Court does not conclude that the Sentencing Commission acted outside its permissible realm of policymaking authority to adopt more stringent punishments for oxycodone than some other opiates. The Court finds this conclusion to be particularly true when it considers that the Sentencing Commission focuses on actual weight of oxycodone for drug equivalency purposes as opposed to net weight for almost all the other opiates. More importantly, applying the guidelines to this case indicates that this conversion ratio creates no significant disparity.

**I.      THE COURT WILL SUSTAIN GRAY'S OBJECTION TO THE REFERENCES IN THE GRAY PSR TO HER BEING A GLORIA CLINIC EMPLOYEE.**

Gray requests that the Court strike alleged factual inaccuracies from the Gray PSR that describe her as Gloria Clinic employee. <u>See</u> Objections at 3-5. She contends that she was Vigil's patient, and that she never received any compensation from Vigil or any of the proceeds from any prescriptions that Vigil sold. <u>See</u> Objections at 4. She asserts that "[a]t no time did [she] have any financial interest in any aspect of the operation of Ms. Vigil's practice or that of the Clinic." Objections at 4. Thus, she asserts, the stipulation to her role as a minor participant in the criminal activity is proper. <u>See</u> Objections at 4-5. The USPO responded to Gray's objection by stating that, while "the defendant was not a legitimate employee, meaning being on Clinica De Gloria's payroll, she was indeed working for Gloria Vigil by running errands and selling prescriptions for her." Addendum at 1. The United States agrees that neither Vigil nor the Gloria Clinic employed Gray "in the traditional sense." <u>See</u> Response at 2.

This factual reference has no impact on Gray's sentencing calculation. The parties are in agreement that Gray was not a Gloria Clinic employee. While the USPO has stood by its position that she was an employee, there is no evidence suggesting that Gray entered into any employment

relationship with the Gloria Clinic. As the USPO concedes, she was never within the Gloria Clinic's employment system, as she was never on their payroll. Thus, the Court will sustain this objection and direct the USPO to remove this reference from the Gray PSR.

## II. THE COURT WILL NOT DISREGARD THE DRUG EQUIVALENCY RATIO METHOD EMPLOYED BY THE GUIDELINES.

At the evidentiary hearing, the Defendants presented an impressive amount of evidence suggesting that relying on marijuana for drug equivalency purposes during sentencing is inherently flawed. The Court recognizes that marijuana has characteristics that distinguish it from many other drugs, including opiates. The Court understands that marijuana may vary significantly in potency and quality. The Court agrees with the Defendants that marijuana is one of the least toxic drugs subject to regulation that people take. The Court does not conclude, however, that the Sentencing Commission improperly chose to rely on marijuana as a common currency for drug equivalency purposes.

The rationale underlying the Supreme Court's decision in Kimbrough v. United States was that it was permissible for a district court judge to vary on a defendant's sentence to avoid disparities between crack cocaine and powder cocaine offenses. See 552 U.S. at 91. That case involved a sentencing guideline "that treated every gram of crack cocaine as the equivalent of 100 grams of power cocaine." Id. at 96. This large disparity in sentencing existed even though there is a lack of empirical evidence that the drugs were significantly different in terms of their overall harmfulness. See id. at 94-100. In light of the lack of empirical evidence to support a distinction between the two drugs and the advisory nature of the guidelines, the Supreme Court found it permissible for a district court to vary downward on a defendant's sentence for crack cocaine to more effectively achieve the factors listed in 18 U.S.C. § 3553(a). See id. at 110-111. The district court heavily relied on the

factor of avoiding unwarranted sentencing disparities between similarly situated defendants.  See id. at 110-11.  In upholding the district court's decision, the Supreme Court emphasized that the district court had considered the guidelines, the factors listed in 18 U.S.C. § 3553(a), the particular facts of the defendant's case, framed its decision in terms of imposing a sentence sufficient but not greater than necessary to satisfy the relevant factors, and did not purport to establish a drug equivalency ratio of its own.  See id. at 110-11.

When the Sentencing Commission adopted an amendment making marijuana the only drug to which other drugs are converted, it provided the following explanation for this amendment:

> In addition, the amendment simplifies the application of the Drug Equivalency Table by referencing the conversions to one substance (marihuana) rather than to four substances; the use of one referent rather than four makes no substantive change but will make the required computations easier and reduce the likelihood of computational error.

U.S. Sentencing Manual app. C, vol. I, at 276 (2003).  Before this change, the sentencing guidelines used, in addition to marijuana as a conversion drug, heroin, cocaine, and PCP.  See U.S. Sentencing Manual app. C, vol. I, at 272-73 (2003).  The sentencing guidelines, for example, once used heroin as the measure by which to convert oxycodone.  See 52 Fed. Reg. at 44,694.  For Schedule I[13] and II[14] drugs, including opiates, the guidelines provide individual marijuana equivalency ratios for each

---

[13]According to the DEA, "[s]ubstances in [Schedule I] have a high potential for abuse, have no currently accepted medical use in treatment in the United States, and there is a lack of accepted safety for use of the drug or other substance under medical supervision."  Office of Diversion Control, Drug Enforcement Administration, U.S. Dep't of Justice, Controlled Substance Schedules, Office of Diversion Control (last visited December 15, 2011), http://www.deadiversion.usdoj.gov/schedules/index.html.

[14]According to the DEA, "[s]ubstances in [Schedule II] have a high potential for abuse which may lead to severe psychological or physical dependence."  Office of Diversion Control, supra. Oxycodone is a Schedule II drug.  See Office of Diversion Control, supra.

drug.  See U.S.S.G. § 2D1.1 cmt. n.10(D).  Other than a handful of Schedule III[15] and IV[16]

substances, the guidelines provide a uniform marijuana equivalency ratio for Schedule III and IV

substances.  See U.S.S.G. § 2D1.1 cmt. n.10(D).[17]  The guidelines provide a uniform marijuana

equivalency ratio for Schedule V[18] substances.  See U.S.S.G. § 2D1.1 cmt. n.10(D).  To explain

these distinctions in the equivalency ratios among the various Schedules, the Sentencing

Commission explained, in terms of the pharmacological basis for the change:

> This amendment substitutes a single conversion for Schedule III substances (1 gm
> of a schedule III substance = 2 gms of marihuana) that will simplify application of
> the guidelines as well as address currently unlisted Schedule III substances.  Because
> the equivalencies for Schedule III substances are not statutorily based, nor are the
> pharmacological equivalencies as clear as with Schedule I or II substances, a generic
> listing was deemed appropriate.  For the same reasons, the amendment provides a
> single conversion for Schedule IV substances . . . and Schedule V substances . . . .

U.S. Sentencing Manual app. C, vol. I, at 275-76 (2003).

The Court recognizes that, "[e]ntrusted within its sphere to make policy judgments, the

Commission may abandon its old methods in favor of what it has deemed a more desirable

'approach,'" for example in changing the method by which it "calculat[es] LSD quantities."

Kimbrough v. United States, 552 U.S. at 104 (quoting Neal v. United States, 516 U.S. at 295).

_____

[15]According to the DEA, "[s]ubstances in [Schedule III] have a potential for abuse less than substances in schedules I or II and abuse may lead to moderate or low physical dependence or high psychological dependence."  Office of Diversion Control, supra.

[16]According to the DEA, "[s]ubstances in [Schedule IV] have a low potential for abuse relative to substances in schedule III."  Office of Diversion Control, supra.

[17]At the time of this amendment converting the guidelines to relying on marijuana as a common currency, Schedule III and IV marijuana conversion ratios were uniform, with the exception of anabolic steroids.  U.S. Sentencing Manual app. C, vol. I, at 275 (2003).

[18]According to the DEA, "[s]ubstances in [Schedule V] have a low potential for abuse relative to substances listed in schedule IV and consist primarily of preparations containing limited quantities of certain narcotics."  Office of Diversion Control, supra.

While relying on marijuana as a common currency for drug equivalency purposes would probably not be a choice pharmacologists would make, that choice may still be appropriate in the context of the criminal justice system. Marijuana is a drug with which the criminal justice system has a great deal of familiarity. The Court recognizes that marijuana's characteristics vary significantly from many other drugs. The Court does not believe, however, that relying on marijuana as a common currency for drug conversion purposes results in unwarranted sentencing disparities among defendants who are charged with different kinds of drug offenses. It may be equally likely that relying on a uniform method of marijuana conversion for all drugs avoids unwarranted sentencing disparities. By varying the specific marijuana conversion ratio for each drug depending on the need for greater or less punishment, the Sentencing Commission can differentiate between drugs for punishment purposes in a straightforward and logical manner. Additionally, as the Sentencing Commission has suggested, such a method may reduce the required number of computations and decrease computational errors. See U.S. Sentencing Manual app. C, vol. I, at 276 (2003). While the Defendants have forcefully argued that this marijuana conversion scheme is improper, they have not articulated how the scheme as a whole impacts their particular sentence. Their complaints focus more on the marijuana equivalency ratio for oxycodone being too high rather than on the scheme itself producing arbitrary results. The Court also notes that, as the Defendants' exhibits indicate, the Sentencing Commission has taken advantage of the benefits of marijuana being a common currency. It has drawn large distinctions between particular drugs to reflect its individual judgment about that drug, such as converting one gram of 3-methylfentanyl to 10,000 grams of marijuana and one gram of codeine to 80 grams of marijuana. See Equivalency Table. The Sentencing Commission has likewise drawn distinctions between virtually all the Schedule I and II substances, including oxycodone and other opiates. See U.S.S.G. § 2D1.1 cmt. n.10(D). Given that the

-29-

Sentencing Commission has shown its willingness to draw significant distinctions between drugs under this marijuana equivalency system, the Court does not see how adopting a different system that employs a uniform currency besides marijuana would result in materially different sentences.

The Court is also conscious that many practicing lawyers as well as employees within the USPO have little or no pharmacological background or training. While those in the pharmacological field would not likely adopt the same system of marijuana equivalency ratios, their goals, objectives, and training are different than those who work in the criminal justice system. As Justice Oliver Wendell Holmes stated:

> The life of the law has not been logic: it has been experience. The felt necessities of the time, the prevalent moral and political theories, intuitions of public policy, avowed or unconscious, even the prejudices which judges share with their fellow-men, have had a good deal more to do than the syllogism in determining the rules by which men should be governed.

Oliver Wendell Holmes, The Common Law 5 (Mark DeWolfe Howe ed., 1963). The sentencing guidelines are a complex scheme, and the Sentencing Commission could properly conclude within its policy role that there was a need to reconfigure drug equivalency conversions to simplify this process and reach more consistent results. See Kimbrough v. United States, 552 U.S. at 104 (quoting Neal v. United States, 516 U.S. at 295). Furthermore, the costs of abandoning this system would, at least in the short run, create significant confusion among district courts and likely increase disparate sentences among similarly situated defendants. While the Court recognizes that the Sentencing Commission's choice of marijuana as a common currency carries with it some problems, the Court is not convinced that the flaws in this system are significant enough to justify abandoning it.

### III.   THE COURT WILL NOT VARY DOWNWARD ON GRAY OR VIGIL'S SENTENCE BASED SOLELY ON THE DRUG EQUIVALENCY RATIO FOR OXYCODONE.

The Court has already made a variety of factual findings and will recite some of those findings here.  To cause the same amount of pain relief, in other words an equianalgesic dose, a person would need to take 30 milligrams of oxycodone as opposed to 15 mg of heroin.  In comparison, the sentencing guidelines equate one gram of heroin to 1,000 grams of marijuana, and one gram of oxycodone to 6,700 grams of marijuana.  An equianalgesic dose of codeine and oxycodone would require 130 mg of codeine and 30 mg of oxycodone.  In comparison, the sentencing guidelines equate one gram of codeine with 80 grams of marijuana, and one gram of oxycodone to 6,700 grams of marijuana.  An equianalgesic dose of morphine and oxycodone would require 30 mg of morphine and 30 mg of oxycodone.  In comparison, the sentencing guidelines equate one gram of morphine with 500 grams of marijuana, and one gram of oxycodone to 6,700 grams of marijuana.  When the Sentencing Commission in 2003 adopted an amendment raising the drug equivalency ratio for oxycodone to 6,700 grams of marijuana, the Sentencing Commission provided the following reason for the amendment:

> This amendment responds to proportionality issues in the sentencing of oxycodone trafficking offenses.  Oxycodone is an opium alkaloid found in certain prescription pain relievers such as Percocet and OxyContin.  This prescription drug generally is sold in pill form and, prior to this amendment, the sentencing guidelines established penalties for oxycodone trafficking based on the entire weight of the pill.  The proportionality issues arise (1) because of the formulations of the different medicines; and (2) because different amounts of oxycodone are found in pills of identical weight.

> As an example of the first issue, the drug Percocet contains, in addition to oxycodone, the non-prescription pain reliever acetaminophen.  The weight of the oxycodone component accounts for a very small proportion of the total weight of the pill.  In contrast, the weight of the oxycodone accounts for a substantially greater proportion of the weight of an OxyContin pill.  To illustrate this difference, a Percocet pill containing five milligrams (mg) of oxycodone weighs approximately

-31-

550 mg with oxycodone accounting for 0.9 percent of the total weight of the pill. By comparison, the weight of an OxyContin pill containing 10 mg of oxycodone is approximately 135 mg with oxycodone accounting for 7.4 percent of the total weight. Consequently, prior to this amendment, trafficking 364 Percocet pills or 1,481 OxyContin pills resulted in the same five year sentence of imprisonment. Additionally, the total amount of the narcotic oxycodone involved in this example is vastly different depending on the drug. The 364 Percocets produce 1.8 grams of actual oxycodone while the 1,481 OxyContin pills produce 14.8 grams of oxycodone.

The second issue results from differences in the formulation of OxyContin. Three different amounts of oxycodone (10, 20, and 40 mg) are contained in pills of identical weight (135 mg). As a result, prior to this amendment, an individual trafficking in a particular number of OxyContin pills would receive the same sentence regardless of the amount of oxycodone contained in the pills.

To remedy these proportionality issues, the amendment changes the Drug Equivalency Tables in §2D1.1 (Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses); Attempt or Conspiracy) to provide sentences for oxycodone offenses using the weight of the actual oxycodone instead of calculating the weight of the entire pill. The amendment equates 1 gram of actual oxycodone to 6,700 grams of marihuana. This equivalency keeps penalties for offenses involving 10 mg OxyContin pills identical to levels that existed prior to the amendment, substantially increases penalties for all other doses of OxyContin, and decreases somewhat the penalties for offenses involving Percocet.

U.S. Sentencing Manual app. C, vol. II, at 387-88 (2003).

It will aid in the disposition of the Defendants' argument for the Court to first address the

role the Sentencing Commission plays in making policy and the role administrative agencies play

as a general matter. Congress has granted the Sentencing Commission authority to issue guidelines

for district courts to apply during sentencing on matters including:

(A)     a determination whether to impose a sentence to probation, a fine, or a term of imprisonment;

(B)     a determination as to the appropriate amount of a fine or the appropriate length of a term of probation or a term of imprisonment;

(C)     a determination whether a sentence to a term of imprisonment should include a requirement that the defendant be placed on a term of supervised release after imprisonment, and, if so, the appropriate length of such a term; [and]

> (D)     a determination whether multiple sentences to terms of imprisonment should
> be ordered to run concurrently or consecutively . . . .

28 U.S.C. § 994.  In <u>Mistretta v. United States</u>, 488 U.S. 361 (1989), the Supreme Court upheld the

constitutionality of the statutory scheme authorizing the Sentencing Commission to issue sentencing

guidelines.  <u>See</u> 488 U.S. at 412.  The Supreme Court found that there was a permissible delegation

of lawmaking authority to the Sentencing Commission and that the Sentencing Commission's

peculiar structure did not violate the doctrine of separation of powers.  <u>See</u> <u>Mistretta v. United</u>

<u>States</u>, 488 U.S. at 412.  The Supreme Court recognized that "[t]he Sentencing Commission

unquestionably is a peculiar institution within the framework of our Government.  Although

placed . . . in the Judicial Branch, it is not a court and does not exercise judicial power.  Rather, the

Commission is an 'independent' body . . . entrusted by Congress with the primary task of

promulgating sentencing guidelines."  <u>Mistretta v. United States</u>, 488 U.S. at 384.  The Supreme

Court further elaborated in upholding the constitutionality of the peculiar structure of the Sentencing

Commission: "Our constitutional principles of separated powers are not violated, however, by mere

anomaly or innovation."  <u>Mistretta v. United States</u>, 488 U.S. at 385.

In discussing the role the Sentencing Commission plays with respect to policymaking, the

Supreme Court recognized that its "jurisprudence has been driven by a practical understanding that

in our increasingly complex society, replete with ever changing and more technical problems,

Congress simply cannot do its job absent an ability to delegate power under broad general

directives."  <u>Mistretta v. United States</u>, 488 U.S. at 372.  Recognizing that Congress has granted the

Sentencing Commission considerable policymaking authority, the Supreme Court held that such

delegations are permissible.  <u>See</u> <u>Mistretta v. United States</u>, 488 U.S. at 372.  Specifically, the

Supreme Court stated:

Developing proportionate penalties for hundreds of different crimes by a
virtually limitless array of offenders is precisely the sort of intricate, labor-intensive
task for which delegation to an expert body is especially appropriate.  Although
Congress has delegated significant discretion to the Commission to draw judgments
from its analysis of existing sentencing practice and alternative sentencing models,
"Congress is not confined to that method of executing its policy which involves the
least possible delegation of discretion to administrative officers."

Mistretta v. United States, 488 U.S. at 379.  The Tenth Circuit has likewise recognized that, even

following the United States v. Booker decision, "the Guidelines are an expression of popular

political will about sentencing that is entitled to due consideration when we determine

reasonableness. [T]he Guidelines represent at this point eighteen years' worth of careful

consideration of the proper sentence for federal offenses."  United States v. Cage, 451 F.3d at 593.

Furthermore, Congress has a continuing role in the Sentencing Commission's proposed amendments

to the sentencing guidelines, which reinforces that the guidelines reflect Congress' intent.  Whenever

the Sentencing Commission chooses to adopt amendments to the sentencing guidelines, it must

promulgate them in the Federal Register and submit those amendments to Congress by May 1st of

each year.  See 28 U.S.C. § 994(p).  Those amendments become effective "no earlier than 180 days

after being so submitted and no later than the first day of November of the calender year in which

amendment or modification is submitted, except to the extent that . . . the amendment is otherwise

modified or disapproved by Act of Congress."  28 U.S.C. § 944.

As a general matter, given the judiciary's institutional limitations, courts should be conscious

about their decisions to second guess the policy determinations that Congress and administrative

agencies reach.  See Exxon Shipping Co. v. Baker, 554 U.S. 471, 520 (2008)("Congress is far better

situated than is this Court to assess the empirical data, and to balance competing policy interests,

before making such a choice."); Buckley v. Fitzsimmons, 509 U.S. 259, 268 (1993)("Our role is to

interpret the intent of Congress in enacting § 1983, not to make a freewheeling policy choice.").

While there will be times where departing from the Sentencing Commission's policy is appropriate, a court should remember that the Sentencing Commission has the staff and resources to study data and react to changes that occur in this country.  Consequently, the Sentencing Commission has the flexibility, when it becomes necessary to do so, to adapt to changing circumstances to accomplish its legislative mandate.  Courts should likewise exercise caution in usurping the role administrative agencies play in developing policy in highly technical and specialized areas.  For example, the distinctions between the various types of opiates at a pharmacological and social level are subtle ones which a district court does not especially have the resources to resolve.  As the Supreme Court recognized in the context of regulations involving specialized medical issues:

> It is precisely this recognition that informs our determination that deference to the Secretary is appropriate here.  The Benefits Act has produced a complex and highly technical regulatory program.  The identification and classification of medical eligibility criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.  In those circumstances, courts appropriately defer to the agency entrusted by Congress to make such policy determinations.

Pauley v. BethEnergy Mines, 501 U.S. 680, 697 (1991).  The complexities of an increasingly specialized world are one of the main reasons Congress delegates its lawmaking authority to these agencies.  See Pauley v. BethEnergy Mines, 501 U.S. at 697.  Additionally, the appropriate punishment or remedy for certain conduct is in many ways a policy decision.  See ABF Freight Sys. v. NLRB, 510 U.S. 317, 324 (1994)("Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy").  District courts have the power to make policy decisions regarding the appropriate sentence in a particular case based on the facts of the case.  At a broader level, the Sentencing Commission has the power to make policy decisions regarding what sentences

are appropriate for offenses as a general matter and which drugs should receive greater punishment. The Court acknowledges that it should not give a sentence arrived at under the guidelines a presumption of reasonableness and that it is not bound by the guidelines. A district court should remain conscious, however, of its own limitations, and take advantage of the resources and skill the Sentencing Commission possesses, much like Congress has.

   **A.   THE SENTENCING COMMISSION MAY PROPERLY DIRECT DISTRICT COURTS, WHEN THEY CONSIDER THE GUIDELINE SENTENCE, TO CONSIDER THE ENTIRE WEIGHT OF ACTUAL OXYCODONE, RATHER THAN THE ENTIRE WEIGHT OF THE MIXTURE OR SUBSTANCE CONTAINING OXYCODONE.**

   The Court recognizes that, based on the 2003 amendment to the oxycodone ratio, the drug equivalency ratio for defendants convicted of oxycodone offenses may result in harsher sentences compared to other opiate offenses. The Court must take into account, however, that other opiate offenses focus on the total weight of the mixture or substance when calculating the drug amount while oxycodone offenses focus on the weight of the actual drug. The sentencing guidelines have demarcated a handful of drugs which require courts to apply the actual weight of the drug as opposed to the total weight of the mixture or substance. See U.S.S.G. § 2D1.1(c) cmt. n.(A) ("Unless otherwise specified, the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance."). The main examples where the guidelines do not apply the total weight of the mixture or substance -- at least for some purposes -- are: (i) PCP; (ii) amphetamine; (iii) methamphetamine; and (iv) oxycodone. See U.S.S.G. § 2D1.1(c) cmt. n.(B).[19] Before 2003, courts looked to the entire weight of the mixture or substance containing oxycodone. See U.S. Sentencing Guidelines Manual

_____

   [19]Similarly, calculations for LSD exclude the "carrier medium (e.g., a sheet of blotter paper)" when calculating the weight of the drug. U.S.S.G. § cmt. n.(B).

§ 2D1.1(c) cmt. n.(A) (2002).  As the explanation for the amendment making this change reveals, the Sentencing Commission felt that the specific characteristics of the oxycodone market and oxycodone mediums warranted this change to make punishment proportional to the culpability of the offense.  See U.S. Sentencing Manual app. C, vol. II, at 387-88 (2003).  Specifically, the Sentencing Commission noted that there are: (i) various formulations of the different medicines that contain oxycodone; and (ii) different amounts of oxycodone found in pills of identical weight.  See U.S. Sentencing Manual app. C, vol. II, at 387-88 (2003).

Much like the situation in Neal v. United States, the Court recognizes that, "[e]ntrusted within its sphere to make policy judgments, the Commission may abandon its old methods in favor of what it has deemed a more desirable 'approach.'"  Neal v. United States, 516 U.S. at 295.  Neal v. United States specifically dealt with the Sentencing Commission revising the method by which it calculates the weight of LSD, as the Commission chose to amend the guidelines and exclude the weight of the carrier medium for LSD when calculating the weight of LSD.  Neal v. United States, 516 U.S. at 295.  The Sentencing Commission concluded that the previous system resulted in disproportionate sentences, as "the weights of LSD carrier media vary widely and typically far exceed the weight of the controlled substance itself."  Neal v. United States, 516 U.S. at 292-93.  Thus, putting aside the issue of the marijuana equivalency ratio the Sentencing Commission chose to adopt for oxycodone, the Court finds the Sentencing Commission's choice to look to the actual weight of the oxycodone, as opposed to the total weight of the mixture or substance, a proper exercise of its policymaking authority.  Given the peculiarities of the oxycodone market, the Sentencing Commission made a rational and reasonable decision to amend the guidelines and require consideration of the actual amount of oxycodone as opposed to the total weight of the mixture or substance.  Additionally, the nuances of this policy decision make it one that the district

-37-

courts should not readily make, as it turns on the intricacies of the oxycodone market -- intricacies which the Court does not have the resources to properly evaluate.  See Exxon Shipping Co. v. Baker, 554 U.S. at 520.

**B.    THE MARIJUANA EQUIVALENCY RATIO FOR OXYCODONE IS NOT SO DISPROPORTIONATE COMPARED TO OTHER OPIATES AS TO RESULT IN UNWARRANTED SENTENCING DISPARITIES.**

Because the drug equivalency calculation for oxycodone relies on a determination of the actual weight of the oxycodone as opposed to a total weight of the mixture or substance, it is somewhat more difficult to make a comparison between oxycodone and other opiates.  The current conversion ratio for oxycodone is 6700 grams of marijuana for one gram of oxycodone.  See U.S.S.G. § 2D1.1 Drug Equivalency Table.  The current conversion ratio for morphine is 500 grams of marijuana for one gram of morphine.  See U.S.S.G. § 2D1.1 cmt. n.10(D).  The current conversion ratio for codeine is 80 grams of marijuana for one gram of codeine.  See U.S.S.G. § 2D1.1 cmt. n.10(D).  The current conversion ratio for heroin is 500 grams of marijuana for one gram of heroin.  See U.S.S.G. § 2D1.1 cmt. n.10(D).

For the Court to properly address this question, it is necessary to take into account the relative purity of these various opiates within the drug trade.  Heroin ranges from five percent to 100 percent purity.  A government study concluded that, in the years between 1981 and 2003, the average purity of heroin ranged from nine-percent purity to forty-percent purity.  See Office of Nat'l Drug Control Policy, supra, at 74.  The Defendants did not present sufficient evidence to the Court to draw any conclusions regarding the standard purity of substances containing morphine and codeine, but the Court assumes that the purity would be comparable to that of pills containing oxycodone, albeit without some of the particular nuances of oxycodone distribution the Sentencing Commission has identified.  The Defendants argue that MS Contin, a pill that contains morphine,

-38-

comes "in 15, 10, 60, 100 & 200 mg doses," but provide no citations to evidence to support these

contentions.  Objections at 15.  "Counsel's arguments are not evidence" upon which a Court can

base its findings.  Luevano v. Holder, 660 F.3d 1207, 1213 (10th Cir. 2011).  The Sentencing

Commission provides some information regarding the purity and different weights of oxycodone

in its comments to the amendment that raised the equivalency ratio for oxycodone.  The Sentencing

Commission notes that there are different formulations of substances containing oxycodone and that

different amounts of oxycodone appear in pills of identical weight.  The Sentencing Commission

stated:

> [T]he drug Percocet contains, in addition to oxycodone, the non-prescription pain
> reliever acetaminophen.  The weight of the oxycodone component accounts for a
> very small proportion of the total weight of the pill.  In contrast, the weight of the
> oxycodone accounts for a substantially greater proportion of the weight of an
> OxyContin pill.   To illustrate this difference, a Percocet pill containing five
> milligrams (mg) of oxycodone weighs approximately 550 mg with oxycodone
> accounting for 0.9 percent of the total weight of the pill.  By comparison, the weight
> of an OxyContin pill containing 10 mg of oxycodone is approximately 135 mg with
> oxycodone accounting for 7.4 percent of the total weight.  Consequently, prior to this
> amendment, trafficking 364 Percocet pills or 1,481 OxyContin pills resulted in the
> same five year sentence of imprisonment.   Additionally, the total amount of the
> narcotic oxycodone involved in this example is vastly different depending on the
> drug.  The 364 Percocets produce 1.8 grams of actual oxycodone while the 1,481
> OxyContin pills produce 14.8 grams of oxycodone.
>
> . . . Three different amounts of oxycodone (10, 20, and 40 mg) are contained in pills
> of identical weight (135 mg).  As a result, prior to this amendment, an individual
> trafficking in a particular number of OxyContin pills would receive the same
> sentence regardless of the amount of oxycodone contained in the pills. . . .
>
> . . . This equivalency keeps penalties for offenses involving 10 mg OxyContin pills
> identical to levels that existed prior to the amendment, substantially increases
> penalties for all other doses of OxyContin, and decreases somewhat the penalties for
> offenses involving Percocet.

U.S. Sentencing Manual app. C, vol. II, at 387-88 (2003).

There is some information in the Gray PSR and Vigil PSR regarding the nature and amount

of oxycodone drugs in this case.  The United States and Gray agreed that she is responsible for 3.6 grams of oxycodone.  That amount of oxycodone converts to 24.12 kilograms of marijuana.  The United States and Gray's stipulation as to the amount of oxycodone arises from her possession of eighty pills of 30 mg oxycodone pills and 120 pills containing 10 mg of Percocet that weighed 335 mg per pill.  The United States and Vigil agreed that she is responsible for the equivalent of at least 700 kilograms but less than 1,000 kilograms of marijuana pursuant to the amount of oxycodone in her possession.  Applying the 6700 grams of marijuana to 1 gram of oxycodone drug equivalency ratio, 700 kilograms of marijuana would equal 104.48 grams of actual oxycodone.  Applying the 6700 grams of marijuana to 1 gram of oxycodone drug equivalency ratio, 1,000 kilograms of marijuana would equal 149.25 grams of actual oxycodone.  The investigation did not reveal the exact amount of illegitimate prescriptions Vigil authored.  Vigil was authoring prescriptions for 30 mg oxycodone pills and Percocet pills, including pills containing 10 mg of Percocet that weighed 335 mg per pill.

The Defendants make many arguments criticizing the Sentencing Commission's decision to amend the guidelines and raise the marijuana equivalency ratio for oxycodone from a 500 grams to 1 ratio to a 6700 grams to 1 ratio.  The Defendants avoid, however, the other aspect of that amendment which instructs courts to consider the actual weight of the oxycodone.  At least for Gray's base offense level, the old version of the guideline and the new version of the guideline would yield the same offense level.  Under the current guideline, 3.6 grams of oxycodone converts to 24.12 kilograms of marijuana.  Under the old guideline, the total weight of the number of pills attributed to Gray would be 40.2 grams for the 120 Percocet pills at 335 mg each and 2.4 grams for the eighty, 30 mg oxycodone pills.  Those 42.6 grams would convert to 21.30 kilograms of marijuana.  The Drug Quantity Table provides the same base offense level of 18 for an amount of

marijuana between twenty kilograms and forty kilograms.  See U.S.S.G. § 2D1.1(c)(11).  Because the current ratio for morphine is 500 grams to 1, the same result would occur if one applied the morphine ratio to the total weight of the pills containing oxycodone that were in Gray's possession. Gray has argued that courts should treat morphine as the most similar opiate to oxycodone for sentencing purposes, and the result is the same under the facts of this case.  See Objections at 13. If one applied the current heroin guideline, 1000 grams to 1, and considered the total weight of the mixture or substance for the pills in Gray's possession, the conversion would yield 42.60 kilograms of marijuana.  That amount of marijuana would give Gray a higher base offense level of 20.  See U.S.S.G. § 2D1.1(c)(10).  Applying the 80 grams to 1 ratio for codeine would benefit Gray, as that would yield only 3.41 kilograms of marijuana.  That amount of marijuana would yield a base offense level of 12.  See U.S.S.G. § 2D1.1(c)(14).  As the Defendants' expert has conceded, however, codeine is significantly less powerful than oxycodone.  See Equivalency Table.  An equianalgesic dose of these two drugs would require 30 mg of oxycodone but would require 130 mg of codeine. See Equivalency Table.   Thus, oxycodone is considered 4.33 times stronger than codeine. Following the Defendants' expert's concept of equating punishment for drugs to their equianalgesic dose, multiplying 3.41 kilograms times 4.33 would yield 14.77 kilograms.   That amount of marijuana would still yield a base offense level of 16.  See U.S.S.G. § 2D1.1(c)(12).  That disparity of 2 offense levels is not so great as to undermine or call into question the Sentencing Commission's decision to punish oxycodone somewhat more heavily than codeine, particularly in light of the number of documented societal harms associated with oxycodone as discussed in the Court's findings of fact.  See ABF Freight Sys. v. NLRB, 510 U.S. at 324 (recognizing that assessing the proper punishment for conduct is a policy matter).  The DEA has also designated codeine as a Schedule V drug and oxycodone as a Schedule II drug.  See 21 C.F.R. §§ 1308.12, .15.  The DEA

has noted that Schedule II drugs "have a high potential for abuse which may lead to severe psychological or physical dependence," while Schedule V drugs "have a low potential for abuse relative to substances listed in schedule IV" and the other Schedules.  Office of Diversion Control, supra.  Thus, the risk of harm codeine poses is significantly less than the risk of harm oxycodone poses.

As the United States has argued, Gray has asked for the best of both worlds.  She requests that the Court apply the old oxycodone conversion ratio of 500 grams to 1, but to only consider the actual amount of oxycodone as provided for by the new guideline.  Dissecting Gray's arguments and applying the guideline conversions in an evenhanded manner leads to the conclusion that Gray's request for a variance lacks a sound basis in the law or the facts of this case.  No gross disparity exists when the Court calculates her base offense level based on the amount of drugs involved in this case.  The same is true when the Court calculates what her base offense level would be by substituting in the same weight in the context of other opiates.  Contrary to her argument that the conversion ratio for heroin would yield a lower sentence, her base offense level would, in fact, be higher if she possessed the same amount of heroin.  Furthermore, the Court's analysis reveals that, at least under the facts of this case, the drug equivalency ratios that Sentencing Commission has adopted are relatively consistent with the pharmacological potency and dangers these various opiates pose.  For example, the Defendants have argued that heroin offenses should receive greater punishment than oxycodone offenses.  When the Court determined the marijuana equivalency for an equal weight of a mixture or substance containing oxycodone or heroin, the heroin conversion yielded a higher amount of marijuana and resulted in a higher offense level.  Likewise, an equal weight of a mixture or substance containing oxycodone or morphine yielded the same offense level when the Court made those calculations.  The Defendants have argued that morphine is the most

similar opiate to oxycodone.  Thus, at least as applied to the facts of this case, the guidelines appear to reflect the pharmacological considerations the Defendants have asserted the guidelines do not take into account.

Furthermore, the Court is conscious that various policy considerations[20] impact the Sentencing Commission's determination of these drug equivalency ratios and sentencing ranges in general.  As Justice Holmes stated:

> The life of the law has not been logic: it has been experience.  The felt necessities of the time, the prevalent moral and political theories, intuitions of public policy, avowed or unconscious, even the prejudices which judges share with their fellow-men, have had a good deal more to do than the syllogism in determining the rules by which men should be governed.

Oliver Wendell Holmes, supra, at 5.  The Court also acknowledges that Congress has designated the

---

[20]Congress has set out several considerations for the Sentencing Commission to take into account, "to the extent that they do have relevance --"

(1)    the grade of the offense;

(2)    the circumstances under which the offense was committed which mitigate or aggravate the seriousness of the offense;

(3)    the nature and degree of the harm caused by the offense, including whether it involved property, irreplaceable property, a person, a number of persons, or a breach of public trust;

(4)    the community view of the gravity of the offense;

(5)    the public concern generated by the offense;

(6)    the deterrent effect a particular sentence may have on the commission of the offense by others; and

(7)    the current incidence of the offense in the community and in the Nation as a whole.

28 U.S.C. § 994(c).

Sentencing Commission with the role of formulating guidelines to promote more just sentences for

defendants, in part because of the task's complexity.  As the Supreme Court has stated:

> Developing proportionate penalties for hundreds of different crimes by a virtually limitless array of offenders is precisely the sort of intricate, labor-intensive task for which delegation to an expert body is especially appropriate.  Although Congress has delegated significant discretion to the Commission to draw judgments from its analysis of existing sentencing practice and alternative sentencing models, "Congress is not confined to that method of executing its policy which involves the least possible delegation of discretion to administrative officers."

Mistretta v. United States, 488 U.S. at 379.  The Tenth Circuit has likewise recognized that, even

following the United States v. Booker decision, "the Guidelines are an expression of popular

political will about sentencing that is entitled to due consideration when we determine

reasonableness. [T]he Guidelines represent at this point eighteen years'," now approximately

twenty-three years', "worth of careful consideration of the proper sentence for federal offenses."

United States v. Cage, 451 F.3d at 593.  While the Court believes that the facts of this case

demonstrate that the Sentencing Commission has properly considered pharmacological principles,

not all of the values and considerations that go into a determination of what is a proper punishment

for an offense can be expressed through pharmacological principles.  For instance, Congress has

directed the Sentencing Commission to consider, among other factors, when arriving at appropriate

sentences:

> (4)    the community view of the gravity of the offense;
>
> (5)    the public concern generated by the offense;
>
> (6)    the deterrent effect a particular sentence may have on the commission of the offense by others; and
>
> (7)    the current incidence of the offense in the community and in the Nation as a whole.

28 U.S.C. § 994(c).  As a Schedule II drug, oxycodone poses significant risks to the public.  The

Sentencing Commission arrives at its advisory sentencing ranges and drug equivalency ratios by taking into account the real world consequences that criminal conduct and controlled substances have.  There is a great deal of documentation and evidence to support that oxycodone has posed significant problems in the past, and that it will continue to do so.  While it is not entirely clear on the record before the Court the degree to which the Sentencing Commission took these four factors into account when amending the oxycodone equivalency ratio, there is a great deal of evidence regarding the serious risks oxycodone poses to society and its increasing prevalence in society. Thus, it is difficult to justify a variance on the basis that the Sentencing Commission did not discuss these considerations in detail absent some evidence that the Sentencing Commission's adoption of this amendment conflicts with the considerations Congress instructed the agency to take into account or that the Sentencing Commission's amendment somehow exaggerates the societal risks oxycodone poses to an improper degree -- as in Kimbrough v. United States.

The Court is also conscious that abuse of drugs like oxycodone, which is already a potent drug that poses many dangers to society, can in some cases lead to abuse of even stronger drugs, such as heroin.  The Defendants have expressed some concern that oxycodone is a drug less affluent people abuse, thus raising some of the same concerns about disproportionate sentences among different groups in society addressed in Kimbrough v. United States.  While their contention may be true at a national level, the Court's experience has been that young people in the more affluent areas of Albuquerque are getting into their parents' medicine cabinets and stealing oxycodone. Eventually, some of these young people, once oxycodone abuse becomes too expensive for them or they require a larger amount of oxycodone beyond what their parents have available, begin to abuse heroin, which is plentiful and relatively inexpensive in Albuquerque.  To the Court's concern, one of the drugs of choice in 2011 for young people in the affluent areas of Albuquerque has been

heroin.  While the Sentencing Commission did not take these considerations as they apply to the Albuquerque area, the Court may consider them in determining whether to grant a variance.

Vigil has also joined in Gray's Objections.  The United States and Vigil agreed that she is responsible for the equivalent of at least 700 kilograms but less than 1,000 kilograms of marijuana pursuant to the amount of oxycodone in her possession.  Applying the 6700 grams of marijuana to 1 gram of oxycodone drug equivalency ratio, 700 kilograms of marijuana would equal 104.48 grams of actual oxycodone.  Applying the 6700 grams of marijuana to 1 gram of oxycodone drug equivalency ratio, 1,000 kilograms of marijuana would equal 149.25 grams of actual oxycodone. The investigation did not reveal the exact amount of illegitimate prescriptions Vigil authored.  Vigil was authoring prescriptions for 30 mg oxycodone pills and Percocet pills, including pills containing 10 mg of Percocet that weighed 335 mg per pill.

Without additional evidence about the exact types of pills in Vigil's possession, the Court cannot as easily conclude whether her argument for a variance lacks merit given the facts of her case.  A defendant bears the burden to demonstrate his or her entitlement to a departure or variance. See United States v. Lopez-Macias, 661 F.3d 485, 487 (10th Cir. 2011)("[A] defendant bears the initial burden of showing entitlement, in some sense, to a variance based on fast-track sentence disparities."); United States v. Sierra-Castillo, 405 F.3d 932, 938 (10th Cir. 2005)("The defendant has the burden of proving entitlement to a downward departure.").  The Vigil PSR indicates that she was responsible for both 30 mg oxycodone pills and 335 mg Percocet pills containing ten mg of oxycodone.  As the Court's calculations and the comments of the Sentencing Commission indicate, punishments for Percocet are lower when one measures the actual weight of the drug as opposed to the entire weight of the mixture or substance.  Given that the Court's analysis of Gray's objections did not convince the Court to vary on her offense level, the Court adopts the same conclusion

regarding Vigil's sentence.  Even if the particular facts regarding the drugs in Vigil's case, which remain unknown at this time, might yield a somewhat lower base offense level when applying a different conversion ratio for another opiate, the Court concludes that any such difference is within the permissible realm of policymaking authority Congress gave to the Sentencing Commission.  The Court concludes that there is no sound reason to vary from the guideline as, at least under the facts of this case, the marijuana equivalency ratio for oxycodone does not result in unwarranted sentencing disparities.

**IT IS ORDERED** that the request for a variance contained in the Defendant's Objection to the Pre-Sentence Report's Factual Inaccuracies and Offense Level Calculations, filed April 8, 2011 (Doc. 71), is denied.  The Court will not vary on Defendant Gloria Vigil's or Ashley Gray's offense level.  The Court will sustain Gray's objections to the references in her Presentence Investigation Report, disclosed February 2, 2011, regarding her employment at Clinica De La Gloria.  The Court will remove those portions of her Presentence Investigatio

_____
UNITED STATES DISTRICT COURT

*Counsel:*

Kenneth J.  Gonzales
   United States Attorney
John C. Anderson
   Assistant United States Attorney
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Marc M. Lowry
Rothstein, Donatelli, Hughes, Dahlstrom & Schoenburg, LLP
Albuquerque, New Mexico

    *Attorneys for Defendant Gloria Vigil*

-47-

James C. Loonam
  Assistant Federal Public Defender
Federal Public Defender's Office
Albuquerque, New Mexico

*Attorneys for Defendant Ashley Gray*