**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA

   Plaintiff,

vs.               No. CR 10-2310 JB

GLORIA VIGIL,

   Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant Vigil's Objections to the Presentence Report & Sentencing Memorandum, filed March 16, 2012 (Doc. 122) ("Objections"). The Court held a sentencing hearing on April 26, 2013. The primary issue is whether the Court should sustain Defendant Gloria Vigil's objection to the United States Probation Office's application of both a 2-level upward adjustment under U.S.S.G. § 3B1.1 for Vigil's aggravating role in the offense, and a 2-level upward adjustment under U.S.S.G. § 3B1.3 for abuse of position of trust or use of a special skill. Although the United States Court of Appeals for the Tenth Circuit requires that the question whether a person abused a position of trust be evaluated from the victim's perspective, the Court concludes that the Tenth Circuit would construe "victim" broadly enough to encompass the community as the victim of Vigil's offense. The Court further concludes that Vigil's position as a nurse practitioner with licensed prescription writing authority was a position of trust, which she abused in a manner that significantly facilitated the offense's commission, because the position of trust was necessary to her commission of the offense of writing illegitimate oxycodone prescriptions. Because U.S.S.G. § 3B1.3's language makes clear that a sentencing court may employ a § 3B1.3

adjustment in addition to a two-level aggravating role adjustment under § 3B1.1 when the § 3B1.3 adjustment is based on abuse of a position of trust, the Court concludes that the PSR's application of both enhancements is not contrary to the United States Sentencing Guidelines.

## FACTUAL BACKGROUND

Vigil was a nurse practitioner, and was the owner and operator of Clinica De La Gloria. See Presentence Investigation Report ¶ 12, at 5, disclosed July 7, 2011 ("PSR").  Vigil, pursuant to her nursing license and New Mexico Board of Pharmacy controlled substances license, had prescriptive authority in the State of New Mexico to handle and prescribe schedule II-V controlled substances.[1]   See PSR ¶ 12, at 5.   Vigil also was able "to apply for a [Drug Enforcement Agency ("DEA")] registration, which would then allow her to administer, dispense, procure, or prescribe controlled substances."  PSR ¶ 12, at 5.  Vigil admits that, on occasion, she wrote prescriptions for oxycodone and provided them to individuals knowing that the prescriptions had no legitimate purpose.  See PSR ¶ 44, at 13.  Angelica Ortega, Ashley Grey, Paul Gutierrez, and Armando Montano helped Vigil illicitly prescribe or distribute oxycodone. See PSR ¶ 13-25, at 5-7.

## PROCEDURAL BACKGROUND

The United States Probation Office ("USPO") disclosed the PSR on July 7, 2011.  In the PSR, the USPO calculates Vigil's total offense level to be 31.  See PSR ¶ 54, at 15.  The USPO calculates a base offense level of 30 based on the drug equivalency tables contained in U.S.S.G.

---

[1] Congress established five schedules for controlled substances to classify drugs or other substances in a sliding scale based on the potential for the substance's abuse, whether the substance has an accepted medical use, and to what degree the substance's use may lead to physical or psychological dependence on the particular drug or other drugs.  See 21 U.S.C. § 812 (Schedules of Controlled Substances).  See Emp't Div., Dep't of Human Res. v. Smith, 494 U.S. 872, 904 (1990)(noting that "peyote is specifically regulated as a Schedule I controlled substance, which means that Congress has found that it has a high potential for abuse, that there is no currently accepted medical use, and that there is a lack of accepted safety for use of the drug under medical supervision.").

§ 2D1.1 and on the parties' agreement that "the equivalent of at least 700 kilograms but less than 1,000 kilograms of marijuana is attributable to the defendant."[2]  PSR ¶ 46, at 14.  The PSR states that the "offense has no identifiable victim."  PSR ¶ 114, at 28.  The PSR includes a 2-level upward adjustment under U.S.S.G. § 3B1.1(c) based on Vigil's status as an "organizer, leader, manager, or supervisor" in the criminal activity for which she was convicted.  PSR ¶ 47, at 14. The PSR includes a 2-level upward adjustment under U.S.S.G. § 3B1.3 based on Vigil's "abuse of position of trust or use of special skill" in the offense.  PSR ¶ 50, at 14-15.  The PSR includes a 3-level reduction under U.S.S.G. § 3E1.1 based on Vigil's acceptance of responsibility.  See PSR ¶ 53, at 15.  The PSR lists her criminal history category as I, based on 0 criminal history points.  See PSR ¶ 57, at 16.  The PSR calculates that an offense level of 31 and a criminal history category of I results in a guideline imprisonment range of 108 to 135 months.  See PSR ¶ 102, at 25.

On March 16, 2012, Vigil filed her objections, objecting to portions of the PSR and supplying to the Court a memorandum to support her contention that the Court should sentence her to eighteen months of home or community confinement.  See Objections at 1.  Vigil first objects to the PSR's paragraph 7, because it states that Ortega is awaiting sentencing and, according to Vigil, Ortega was sentenced June 30, 2011.  See Objections at 1-2.  Vigil's second objection is to the PSR's assertion that Montano is a co-Defendant.  See Objections at 2. Although she concedes that the PSR's observation that Montano was named in Count 3 of the

---

[2] Vigil's co-Defendant Gray objected to the equivalency ratio between marijuana and oxycodone.  See Defendant's Objection to the Pre-Sentence Report's Factual Inaccuracies and Offense Level Calculations, filed April 8, 2011 (Doc. 71).  Vigil joined in that challenge.  See Defendant Gloria Vigil's Notice of Joining Co-Defendant Ashley Gray's Challenge to the Federal Sentencing Guidelines Manual's Marijuana Equivalency for Oxycodone, August 17, 2011 (Doc. 102).  This dispute was the focus of the USPO's Addendum to the Presentence Report (disclosed August 25, 2011).  The Court disposed of the equivalency issue in its Memorandum Opinion and Order, filed December 19, 2011 (Doc. 114).

Indictment is factually correct, Vigil asserts that "it is pragmatically wrong, and should be struck from the report," because "Montano was never arraigned, was never assigned an attorney, and the case against him was never prosecuted."  Objections at 2.  Third, Vigil objects to paragraphs 24 and 25, because, in her view, they incorrectly state the nature of her relationship with Montano.  See Objections at 2.  The PSR repeats Montano's account of conversations between Montano and Vigil in which they coordinated facets of drug exchanges; Vigil argues that the evidence, including the DEA's observations of Vigil's clinic and Montano's telephone records, contradicts Montano's account, and instead suggests that Montano dealt directly with Ortega and Gray.  See Objections at 2 (citing Phone Examination Report at 5, dated August 9, 2011; Report of Investigation at 1, dated August 2, 2010).  Fourth, Vigil objects to paragraph 40, because it indicates that Ortega and Gray used money that was collected during drug exchanges solely to support their own drug abuse, when the evidence shows that they used the money to pay personal bills as well.  See Objections at 3 (Report of Investigation at 1, executed August 2, 2010).

In her fifth and most substantial objection, Vigil objects to paragraphs 49-50, arguing that the PSR cannot simultaneously apply to Vigil the sentencing enhancement for organizing, leading, managing, or supervising criminal activity, and the sentencing enhancement for abusing a position of trust.  See Objections at 4.  In support of this view, Vigil argues that her conduct cannot be characterized as an abuse of the public trust, but that it instead falls under the use of a "special skill."  Objections at 4-5.  Vigil contests the PSR's conclusion that her ability to create fake patient charts "enabled her to escape detection," arguing that her capacity to do so did not deceive the investigators.  Objections at 5.  Further, Vigil argues that, because the Court must assess an abuse of trust from the victim's point of view, and, because this crime has no victim, this crime cannot be an abuse of trust.  See Objections at 4-5.  Finally, Vigil asserts that, because

her conduct is properly viewed as the use of a special skill and not a breach of the public trust, the Court may apply either the enhancement for abuse of the public trust or for organizing criminal activity, but it must not apply both enhancements. See Objections at 6. To support that proposition, Vigil quotes language from U.S.S.G. § 3B1.3: "If this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under §3B1.1 (Aggravating Role)." Objections at 6.

In her sixth argument, Vigil objects to the PSR's decision not to recommend a downward departure for physical condition. See Objections at 7. The PSR acknowledges her history of various health problems, including high blood pressure, diabetes, nerve pain, and a number of significant surgeries, but declines to recommend a downward departure. See PSR ¶ 121, at 29-30. Vigil argues that the PSR errs, because it fails to consider that the lingering effects of Vigil's childhood polio and her extended separation from her family for those effects' treatment resulted in depression and post-traumatic stress disorder. See Objections at 7-8. Vigil cites several documents as evidence of her troubled physical and psychological history and condition: (i) the Evaluation of Gloria E. Vigil by Elliot J. Rapoport, Ph. D., dated August 11, 2011; (ii) Records Relating to Gloria E. Vigil's Total Knee Replacement, dated July 25, 2005; (iii) Additional Records Relating to Gloria E. Vigil's Total Knee Replacement, dated August 1, 2005; (iv) Miscellaneous Medical Records, various dates; Records Relating to Gloria E. Vigil's Hip Operation, various dates; and (v)Additional Miscellaneous Medical Records, various dates. See Objections at 7. Vigil points to a number of serious problems that her childhood polio caused and argues that her physical and mental health problems warrant a downward departure. See Objections at 8-9.

In her seventh and final objection, Vigil contests the PSR's characterization of her mental health claims.  <u>See</u> Objections at 9-10.  The PSR said that Vigil could not document the duration and nature of her alleged treatment for depression; Vigil asserts that she now has documentation for at least some of that time, and further contents that she has since undergone a psychological evaluation, which concludes that she suffers from a major depressive disorder and post-traumatic stress disorder.  <u>See</u> Objections at 9-10 (citing Medical Records Related to Gloria E. Vigil's Depression, various dates).  She states that, "[b]ecause Vigil's physical and emotional conditions . . . coexist and reinforce each other, and have caused a host of secondary complications, they should be considered together" to justify a downward departure.  Objections at 11.

Turning from her objections to the PSR to what her sentence should be, Vigil then focuses on the Sentencing Guidelines and argues that the Court should not presume that they are reasonable, but should select a sentence sufficient, but not greater than necessary, to punish her. <u>See</u> Objections at 11-12.  Vigil underscores that the Court's variance determinations would be entitled to great deference.  <u>See</u> Objections at 12-13.  In requesting a variance, Vigil argues that she was otherwise law-abiding, that she cooperated with the authorities, and that no contraband was found in her car or her home.  <u>See</u> Objections at 14.  Vigil asserts that "[s]he immediately and voluntarily surrendered her DEA registration and her New Mexico Board of Pharmacy license to dispense drugs to the DEA agents" immediately and that she also "voluntarily gave up her nursing license.  Objections at 13 (citing Settlement Agreement, executed May 7, 2011). She further argues that she had worked with the underprivileged, and points out that she had been separated from her family from a young age while being treated for polio; relying again on her psychological evaluation, she argues that this separation created mental problems that

contributed to her commission of the crime.  <u>See</u> Objections at 14.  Further, Vigil argues that she had "punished herself a great deal" by losing her nursing license, with her own "harsh self-criticism," and with the shame that she brought on herself and her family, all of which have led to suicidal thoughts.  Objections at 14-15 (internal quotation marks omitted)

Vigil argues that eighteen months of house arrest or community confinement would be sufficient punishment.  <u>See</u> Objections at 15.  First, she argues that her compliance with the authorities reflects her perception of the seriousness of the offense.  <u>See</u> Objections at 15.  She also points out that Ortega was sentenced only to thirty days of house arrest, that Gutierrez was not charged with a crime, and that Montano was only charged and not prosecuted, and argues that those facts reflect on the seriousness of the offense.  <u>See</u> Objections at 15-16.  In her view, "eighteen months of house arrest following nearly eleven months of incarceration adequately punishes Defendant Vigil for her conduct."  Objections at 16.

Vigil then turns to deterrence.  Regarding general deterrence, she argues that, when combined with her mental anguish, her nearly year-long incarceration, and her loss of her professional privileges, eighteen months of house arrest would be sufficient to deter others.  <u>See</u> Objections at 16.  Regarding specific deterrence, Vigil maintained that she would not commit future crimes, because she now lacks the ability to write prescriptions, and because she lacks a criminal history.  <u>See</u> Objections at 16.

Vigil also argues that home detention would allow her to obtain treatment for her mental and physical health conditions in the most cost-effective manner.  <u>See</u> Objections at 17.  Further, she contends that she poses no danger to the community, that a period of incarceration beyond that which she had already experienced would be vastly disproportionate to the punishment that her co-Defendants received, and that house arrest is sufficient to allow Vigil to care for her

significant health needs while also punishing her.  See Objections at 18.  She also points out that Dr. Elliot J. Rapoport, Ph.D., evaluated her psychological condition and "did not deem it necessary to impose a prison sentence in this matter, given her chronic mental health and physical impairments"; Vigil "respectfully requests that this Court agree."  Objections at 19.

The United States addresses some of these concerns in its Response to Defendant's Objections to the Presentence Report and Sentencing Memorandum, filed March 24, 2012 (Doc. 131)("Response").  Regarding Vigil's objection about Ortega's sentencing, the United States concedes that it should be sustained, because Ortega has been sentenced.  Response at 1. Regarding her objection to calling Montano a co-defendant, the United States indicates that it intends to pursue his arrest and prosecution, and that, therefore, the Court should overrule the objection.  See Response at 2.  Regarding her discussion of dealings between Vigil and Montano, the United States contends that it is not relevant to sentencing, and that the Court should not, therefore, rule on it.  See Response at 2-3.  Further, the United States argues that Vigil's characterization of her relationship with Montano is incorrect, given that Montano received prescriptions Vigil had issued and given that Vigil's plea agreement indicated that Vigil had provided Ortega and Gray with prescriptions, thus controverting her present suggestion that Ortega and Gray sold prescriptions to Montano independently.  See Response at 3.  Regarding Vigil's argument that Ortega and Gray had used the drug proceeds to pay their personal bills, the United States maintains this fact would not affect sentencing.  See Response at 3.

Regarding Vigil's contention that the enhancements for abuse of trust and aggravating role cannot be applied simultaneously, because the enhancement arises from the use of a special skill, the United States replies that "[her] position is contrary to clearly established law." Response at 4.  The United States points out that Vigil cites no cases for her view that writing

- 8 -

unlawful prescriptions is the use of a special skill and not an abuse of trust, and it further argues that "several cases have held that prescription writing authority constitutes a public trust and that enhancements for unlawful issuance of prescriptions relate to an abuse of that trust."  Response at 4 (citing <u>United States v. Louis</u>, 559 F.3d 1220 (11th Cir. 2009); <u>United States v. Shinderman</u>, 474 F. Supp. 2d 180 (D. Maine 2007)).  Regarding Vigil's argument that she should receive a downward departure for her health conditions, the United States replies that her challenges "are not so extraordinary as to merit a downward departure" and points out that she does not argue that the Bureau of Prisons will be unable to provide Vigil with sufficient care.  Response at 4-.5

Turning from Vigil's objections to the PSR to what her sentencing should be, the United States first discusses the seriousness of the offense: specifically, it points to her acts in writing "numerous prescriptions for oxycodone, hydrocodone and other controlled substances to various individuals in exchange for cash" with knowledge that the drugs that she prescribed would be sold to others, and that she "wrote many of these prescriptions in false names and even created false patient charts to create the illusion of a legitimate patient-provider relationship."  Response at 6.  The United States suggests that her actions were "doubly tragic," because she used her position as a service provider in an underserved community "to enrich herself at the expense of the health and well-being of the larger community," thereby "magnifying [the problems that unlawful prescription drug use causes] by trafficking in these same prescription drugs."  Response at 6.

The United States further argues that, although Vigil had no criminal history before these events, the Court should nevertheless recognize that this conduct happened over a long period and that it represents a deliberate decision to abuse her position.  <u>See</u> Response at 7.  The United States also points to Vigil's "rather sophisticated efforts to avoid detection of her scheme by

regulatory authorities or law enforcement, including the creation of false patient charts and the issuance of prescriptions in false names." Response at 7. The United States also disputes the relevance of her health conditions to her sentence and says that "it is difficult to credit the notion that her health condition made it more difficult for her to decline requests for unlawful prescriptions." Response at 7.

Regarding Vigil's argument about disparate sentences, the United States argues that Vigil's role vastly differed from her co-Defendants' roles, because she alone could write the relevant prescriptions. See Response at 8. Further, the United States argues that "Vigil wrote a large number of illegitimate prescriptions in which the co-defendants had little or no involvement." Response at 8. "In short," the United States argues, Vigil's "attempt to compare herself to others, both charged and uncharged, is simply unavailing." Response at 8.

Regarding Vigil's argument that "her post-arrest conduct, the loss of her medical license and her term of incarceration to date is sufficient to reflect the seriousness of the offense and demonstrate Defendant's respect for the law," the United States replies that her cooperation with law enforcement is not "the type of respect for the law contemplated by § 3553." Response at 8. Further, the United States argues that "the loss of [the privilege of her nursing license] is not sufficient punishment to promote respect for the law." Response at 8-9. Finally, with regard to Vigil's argument that she needs medical attention, the United States contends that her issues do not justify a downward variance for two reasons: first, the United States asserts, there is no reason to believe she cannot receive adequate care from the Bureau of Prisons; and second, Vigil "offers no suggestion that medical treatment provided at a BOP facility would be so much less cost-effective as to outweigh the remainder of the § 3553(a) factors properly considered by this Court." Response at 9.

The Court received sixteen letters of support from Vigil's family and friends.

In its Second Addendum to the Presentence Report (disclosed April 4, 2012)("Second Addendum"), the USPO explains its position on each of Vigil's objections.  The USPO first addresses Vigil's factual arguments.  The USPO concedes that Ortega was sentenced on June 30, 2011, but contends that "specific information regarding the disposition is unavailable."  Second Addendum at 2.  The USPO defends its listing Montano as a co-Defendant in the PSR on two bases:  (i) he was named as a co-Defendant in Indictment, filed August 10, 2010 (Doc. 33); and (ii) he remains listed as a Defendant on the docket sheet.  See Second Addendum at 2.  The USPO asserts that the PSR's description of Vigil's relationship with Montano is accurate, that it "was obtained directly from discovery material prepared by the [DEA]," and that the PSR includes that description "because the statements provided by the co-defendants is pertinent information regarding the offense, and the statements are necessary to grasp a full understanding of everyone's behavior and involvement in the instant offense."  Second Addendum at 2.  The USPO maintains that the PSR's description of the purpose for which Ortega and Gray used the proceeds from the sale of prescription drugs is accurate.  See Second Addendum at 2.

With respect to Vigil's objection to the organizer/leader adjustment, the USPO asserts that Vigil

> admits she wrote prescriptions for oxycodone and provided them to individuals knowing that the prescriptions she wrote had no legitimate medical purpose. Further, she received payment for the prescriptions and would create false entries in the medical files to make the prescriptions appear to be legitimate.  The defendant is at the center of this conspiracy because she wrote illegitimate prescriptions for Oxycodone and then disseminated them to the co-defendants. She used the co-defendants to distribute the Oxycodone and to obtain money for her own use.  She earned money by using others, including the co-defendants, to give her lists of names to create false prescriptions to distribute oxycodone.

Second Addendum at 3-4.  In essence, the USPO maintains that she was central to the conspiracy

because of her unique ability to write prescriptions, that she made greater profit from prescription sales, that she "was highly involved in the planning and organizing of the offense, and [that] she was aware of the nature and scope of the conspiracy," thus justifying the aggravated-role adjustment.  Second Addendum at 4.

With respect to Vigil's objection to the abuse-of-the-public-trust adjustment, the USPO asserts that Vigil's position as a board-certified nurse practitioner who ran an independent medical clinic gave her the freedom and ability to commit these crimes and to cover them up, and that she misused her professional licenses -- which were designed to empower her to protect to protect the public's health -- "by writing prescriptions for those who had no medical need." Second Addendum at 4-5.

With respect to Vigil's argument that she should receive a downward departure for her physical condition, the USPO asserts that, although "it is unfortunate that she suffers from medical conditions, . . . her situation is not extraordinary."  Second Addendum at 5.  The USPO points out that, although she has had surgeries, she recovered from those functions sufficiently well to operate her clinic, and argues that "her physical conditions have not hindered her ability to care for herself or others."  Second Addendum at 5.  Moreover, they assert that the Bureau of Prisons can care for Vigil.  See Second Addendum at 6.

With respect to Vigil's contention that she can now provide records to substantiate her assertion that she has long suffered from depression, the USPO asserts that it appears that Vigil has suffered from depression since 1982, and that, because she only recently turned to crime, "it appears the defendant's conduct stemmed from financial strains rather than her mental health conditions."  Second Addendum at 6.  Moreover, the USPO claims that her mental health issues do not warrant a downward departure, because she has functioned "as a productive and trusted

member of society, despite her depression and PTSD." Second Addendum at 7. Because Vigil "has been a productive member of society, and was law abiding for a significant period of her life even though she suffered from depression and PTSD," the USPO does not recommend a departure on the basis of her mental health issues. Second Addendum at 7.

On April 22, 2013, Vigil filed her Notice of Intent to Introduce Sentencing Evidence Under Rule 32(h)(2), filed April 22, 2013 (Doc. 200)("Polygraph Evidence"), in which she offers the results of a control-question polygraph examination that, according to her, support her Objections. See Polygraph Evidence at 1. The Polygraph Evidence includes attachments that purportedly demonstrate that, during her polygraph examination, Vigil truthfully denied originating the drug-distribution scheme at issue. See Polygraph Evidence at 3-10.

The Court held a sentencing hearing on April 26, 2013. See Transcript of Hearing, taken April 26, 2013 ("Tr.").[3] At the hearing, with Vigil's consent, the Court overruled Vigil's objections to paragraphs 7-8. See Tr. at 3:16-4:2 (Court, Lowry). The Court turned its attention to Vigil's objection to the dual enhancements and asked her why they should be viewed as mutually exclusive. See Tr. at 4:18-5:25 (Court, Lowry). Vigil principally relied upon two arguments. First, she reiterated her view that there was no victim in this case. See Tr. at 6:1-9 (Lowry). Second, she cited the decision of the United States Court of Appeals for the Fourth Circuit in United States v. Sipsy, 287 F. App'x 270 (4th Cir. 2008)(unpublished), and the comment to U.S.S.G. §3B1.3, to establish the proposition that prescription writing authority is the use of a special skill and not a breach of trust. See Tr. at 6:10-8:11 (Court, Lowry). According to Vigil, in United States v. Sipsy, the Fourth Circuit rejected the defendant's argument that the district court had imposed a breach-of-trust enhancement under § 3B1.3 for

_____

[3] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

writing prescriptions, saying that the record indicated that the district court had imposed that enhancement for use of a special skill; in Vigil's view, that distinction indicated a relevant difference. See Tr. 7:1-15 (Lowry, Court).

Returning to the significance of an identifiable victim, the Court countered that the Tenth Circuit left the scope of the term "victim" unresolved in its decision in United States v. Edwards, 325 F.3d 1184 (10th Cir. 2003), and asked why the Court should construe it narrowly in this case. Tr. at 8:12-19 (Court). Vigil conceded that there are cases that apply "breach of public trust" when there is a substantial injury to the public at large, and articulated a fallback position: that the conduct that would constitute a breach of the public trust -- prescription writing authority -- has already been punished by the enhancement under § 3B1.1 for being a leader of criminal activity, and that the Court should not "double count[]" that conduct. Tr. at 8:20-10:22 (Court, Lowry).

The Court turned its attention to the United States, asking how it responded to the Tenth Circuit's focus on the existence of a victim. See Tr. at 11:12-17 (Court). The United States responded that the Controlled Substances Act views society at large as a victim, and, further, that the power to dispense controlled substances is a quintessential public trust. See Tr. at 11:18-12:17 (Court, Anderson). The Court asked how the United States responded to United States v. Sipsy; it responded that the language Vigil cited was too equivocal for the Court to ascribe to it the meaning Vigil suggests. See Tr. at 12:18-13:2 (Court, Anderson). The Court discussed Tenth Circuit decisions interpreting the breach-of-trust enhancement, and asked the United States how it reconciled those that, on the one hand, analyze the issue by looking at the existence of a victim, with those that, on the other hand, define breach of trust in terms of the degree of authority and discretion exercised by the defendant. See Tr. at 13:14-21 (Court). The United

- 14 -

States replied that it might not be able to reconcile them, but that the act of dispensing drugs at a pharmacy satisfied the authority-and-discretion standard as well.  See Tr. at 13:22-14:14 (Anderson).  On rebuttal, Vigil argued that the passages in United States v. Louis, 559 F.3d 1220 (11th Cir. 2009) and United States v. Shinderman, 474 F. Supp. 2d 180 (D. Maine 2007), on which the United States relies are dicta, and reiterated her reliance on United States v. Sipsy. See Tr. at 14:21-15:23 (Lowry).

The Court overruled Vigil's objection.  See Tr. at 19:5-6 (Court).  The Court concluded that, because Vigil held a position of authority and discretion in the community, she held a position of trust within the meaning of the guidelines, and that the term "victim" should be construed to include the community as a victim.  See Tr. at 15:24-17:22 (Court).  The Court also disagreed with Vigil's double-counting argument.  See Tr. at 19:10-11 (Court).  In the Court's view, having a special skill and abusing a trust are different, and punishing them serves different interests.  See Tr. at 19:11-23 (Court).

The Court then turned to the factual disputes underlying Vigil's objections to paragraphs 24, 25, and 40.  See Tr. at 21:3-21:4 (Court).  After some discussion, the United States, Vigil, and the Probation Officer agreed to add the following to paragraph 25:

> Vigil contends that she did not provide Montano with names or prescriptions on May 12th or 13th, 2010, nor communicated with Montano about where to meet to obtain prescriptions.  Montano's telephone records do not support his assertion that he would call Vigil with the name he wanted to use and she would tell him where they were going to meet.

Tr. at 21:3-23:20 (Court, Lowry, Anderson, Probation Officer).  The Court otherwise overruled the objection.  See Tr. at 23:21-23 (Court).  With the agreement of the parties, the Court also added to paragraph 40 that Ortega and Gray used money from the sale of drugs for their personal

bills; it otherwise overruled the objection.   See Tr. at 24:7-18 (Court, Anderson, Lowry, Probation Officer).

Vigil next underscored her objection to the criminal leader/organizer enhancement: (i) she took a polygraph test in which she said, apparently truthfully, that she had never solicited anyone into her scheme; (ii) witnesses who did not appear would have said she had stopped criminal activity immediately after her arrest, while her co-Defendants did not; and (iii) while she concededly played a fundamental role in the arrangement, she neither came up with the idea for the conspiracy nor solicited people to become involved.   See Tr. at 24:19-27:19 (Lowry). The United States responded that Vigil derived significant revenue from this business, that she wrote prescriptions that did not go through her co-Defendants, and that she took most of the proceeds.   See Tr. at 27:20-28:17 (Court, Anderson).   Further, the United States contended that she falsified charts and wrote prescriptions, which reinforces her central role in the conspiracy. See Tr. at 28:18-29:4 (Anderson).   Vigil replied by arguing that there is no basis to believe she received as much of the proceeds as the United States suggests.   See Tr. at 29:7-19 (Lowry). Although it would alter this conclusion later, at this point in the hearing, the Court concluded the United States had established that a two-level enhancement for her aggravated role was appropriate, and thus overruled Vigil's objection.   See Tr. at 29:20-32:20 (Court).   The Court also granted the United States' motion to adjust the offense level downward for acceptance of responsibility.   See Tr. at 32:25-33:7 (Court, Lowry).   Referring to Attachment A to the PSR, the Court also clarified that it would modify the standard condition that requires the "defendant [to] notify third parties of risks that may be occasioned by the defendant's criminal record" and permits her probation officer to make such disclosures; the Court concluded that Vigil would not

need to notify employers and that her probation officers were not permitted to do so.  Tr. at 33:10-34:4 (Court, Lowry).

Before proceeding to consider Vigil's argument for a downward departure, the Court confirmed the Guidelines range: offense level of 31, criminal history category of I, which produced a Guidelines imprisonment range of 108-135 months; Vigil confirmed that understanding.  See Tr. at 34:13-22 (Court, Lowry).  Vigil then argued for a downward departure based on the factors of physical and mental health.  See Tr. at 34:25-38:16 (Court, Defendant, Lowry).  The United States argued that those problems were not of such a degree as to justify a downward departure.  See Tr. at 38:22-39:6 (Anderson).  The Court substantially agreed with the United States and decided not to depart, although the Court indicated it would consider those factors with regard to Vigil's variance.  See Tr. at 39:17-42:21 (Court).

In arguing for a variance, Vigil first spoke at length about faults she perceived in the Guidelines.  Vigil began by stating that, under recent Supreme Court precedent, the Court should not presume that the Guidelines are reasonable.  See Tr. at 43:7-13 (Lowry).  Vigil then discussed United States v. Diaz, No. 11-CR-00821-2 (JG), 2013 WL 322243 (E.D.N.Y. January 28, 2013), in which the Honorable John Gleeson, United States District Judge of the United States District Court for the Eastern District of New York, expressed at length his dissatisfaction with the Guidelines as they are applied in drug trafficking offenses.  See Tr. at 43:20-44:14 (Lowry).  In brief, Judge Gleeson believes that "Congress made a mistake" in its construction of the Guidelines and that the Guidelines are insufficiently tethered to individual culpability; as a result, he intends to put very little weight on the Guidelines in drug-trafficking cases involving heroin, cocaine, and crack.  See United States v. Diaz, 2013 WL 322243, at *1-5.  The Court engaged in a colloquy with Vigil about the merits of Judge Gleeson's opinion, and the wisdom of

a federal judge leveling such an extended critique of the Commission and Congress in an opinion.  See Tr. at 44:15-46:8 (Court, Lowry).  The Court suggested that the Commission responded as it should have to Congress' expression of the national political will.  See Tr. at 45:23-46:8 (Court).

Vigil then turned to the more general principle that the Court must individualize her sentence.  See Tr. at 47:21-48:20 (Lowry).  Vigil critiqued the Guidelines as an example of formalism and asked the Court to vary from the Guidelines so as to effectively individualize her sentence.  See Tr. at 48:21-50:11 (Lowry).  Vigil referred to certain letters to the Court describing her admirable character, arguing that the episode is merely a lapse of judgment in which she became trapped, one that should not entirely invalidate previous efforts to serve the underprivileged.  See Tr. at 50:11-53:10 (Lowry).  She argued that she cooperated with law enforcement; that the damage done to her personal and professional life would deter both her and observers from future illegality; that she would never be able to commit this crime again, because she had forfeited her license; that the length of her sentence should not be increased so she can benefit from medical or psychological care in the Bureau of Prisons; that she has had time to reflect on her actions; and that the Court did not need to sentence her to any additional time to satisfy these sentencing goals.  See Tr. at 53:12-56:11 (Lowry).  Upon the Court's request, Vigil clarified that she had been imprisoned for almost two years.  See Tr. at 56:12-21 (Court, Lowry).  Vigil pointed out that none of the co-Defendants in this case were punished more severely than by house arrest.  See Tr. at 56:18-22 (Lowry).  Vigil also quoted a recent press release from the United States Attorney's Office discussing a $635 million fine the corporate manufacturer of OxyContin paid for having fraudulently marketed the drug as "less addictive[,] less subject to abuse[,] and less likely to cause withdrawal;" in Vigil's view, the

corporation's punishment was light when compared to what Vigil faced.  See Tr. at 56:22-58:2 (Court, Lowry).[4]  Vigil conceded that her sentence, the co-Defendants' sentences, and the corporation's fine are different situations, but reiterated her request that the Court individualize her sentence and render mercy.  See Tr. at 58:3-17 (Lowry)

Upon the Court's invitation, Vigil then spoke on her own behalf.  See Tr. at 58:19-24 (Court, Defendant).  Vigil stated that, after decades of practicing medicine, she got tired and forgot her boundaries.  See Tr. at 58:25-59:13 (Court, Vigil).  She spoke about the damage done to her relationships with friends and family; said that her time in jail had given her time to appreciate her mistakes; and noted that she cannot say "no," because she cares too much.  Tr. at 59:13-22 (Vigil).  She emphasized that she will never practice medicine again, but also underscored the good she had done when she did practice.  See Tr. at 59:3-60:7 (Vigil).  She asked the Court to allow her to go home with her family, taking into account her limited financial means, her age, and her desire to leave New Mexico.  See Tr. at 60:7-61:12 (Court, Vigil).

The Court revisited Vigil's objection to the criminal leader/organizer role enhancement. See Tr. at 61:16-19 (Court).  The Court indicated that her brief had not raised the factual argument on which she now relied -- that she was not a leader or organizer -- as opposed to a legal argument that the leader/organizer role enhancement was exclusive of the breach-of-trust enhancement; after reviewing relevant law, the Court reconsidered its earlier decision to overrule the objection.  See Tr. at 61:16-62:11 (Court).  The Court cited Tenth Circuit authority for the proposition that the weight of the leader/organizer role enhancement is about control, organization, and responsibility for the action of others, and not to whether the individual was an

---

[4] The press release is available on the Internet.  See John L. Brownlee & Heidi Coy, The Purdue Frederick Company, Inc. and Top Executives Plead Guilty to Misbranding OxyContin; Will Pay Over $600 Million, TRICARE, http://www.tricare.mil/fraud/News/Document/ purdue_freder.pdf.  The sentencing opinion in the case to which the press release refers is United States v. Purdue Frederick Company, 495 F. Supp. 2d 569 (W.D. Va. July 23, 2007).

important or essential figure. <u>See</u> Tr. at 62:12-63:18 (Court). Upon reviewing its earlier ruling, the Court said that the factors it had listed in overruling the objection mainly went to whether she was an important figure, and not to whether she was a leader/organizer. <u>See</u> Tr. at 62:19-63:3 (Court). In the Court's view, the facts do not demonstrate that Vigil had sufficient control over her co-Defendants to qualify as a leader. <u>See</u> Tr. at 63:4-63:22. The Court, therefore, sustained Vigil's objection to the criminal leader/organizer role enhancement, and recalculated the offense level as 29 and, thus, the Guidelines range at 87-108 months. <u>See</u> Tr. at 62:63:24-25 (Court).

In opposition to Vigil's request for a variance, the United States first addressed the disparity between the Guidelines range and the punishment for her co-Defendants. <u>See</u> Tr. at 64:5-16 (Court, Anderson). The United States stated that, because "Vigil was the one who was writing these prescriptions," and "without her ongoing willing participation this entire conspiracy would have ground to a halt," "a significant disparity [was] warranted." <u>See</u> Tr. at 64:17-65:5 (Court, Anderson). The Court conceded that there should be a difference between the sentence that Vigil received and the sentence that the co-Defendants received, but questioned whether the length of the difference was appropriate; the United States replied that there is a large disparity, but that it would advocate for a Guideline sentence. <u>See</u> Tr. at 65:6-16 (Court, Anderson). The United States also spoke in defense of the Guidelines, emphasizing that they promote uniformity, as the Court has previously observed. <u>See</u> Tr. at 65:17-66:7 (Anderson). The United States also distinguished <u>United States v. Diaz</u>, arguing that Judge Gleeson had conceded that the Guidelines might be appropriate in cases involving drugs other than heroin, cocaine, and crack, <u>see</u> <u>United States v. Diaz</u>, 2013 WL 322243, at *1 n.3, and underscored that oxycodone and other prescription drugs have been a significant problem in New Mexico. <u>See</u> Tr. at 66:8-67:20 (Anderson).

The Court then indicated his disagreement with Judge Gleeson's opinion.  See Tr. at 67:21-68:3 (Court).  The Court stated that it did not share Judge Gleeson's disagreement under Kimbrough v. United States with the Guidelines, either generally or with oxycodone in particular.  See Tr. at 68:4-13 (Court).  Further, the Court stated that Judge Gleeson had not recognized that these Guidelines are the result of the political process, and that an attack on the Sentencing Commission might not be an appropriate way to deal with such disagreements, given recent decisions of the Supreme Court of the United States permitting judges to individualize sentences by varying from the Guidelines.  See Tr. at 68:14-22 (Court).  The Court granted that he could not presume that the Guidelines were reasonable, but stated that, together with the relevant decisions of the Supreme Court, the Guidelines help strike the necessary balance between uniform sentencing across the nation and individualized sentencing.  See Tr. at 68:22-69:10 (Court).

The Court then discussed twelve factors exerting downward pressure on Vigil's sentence. See Tr. at 69:11-12 (Court).  They were as follows: (i) her physical condition; (ii) her difficult childhood; (iii) her chronic depression; (iv) her dedication to serving the underprivileged, as discussed in letters which the Court received; (v) her depression made her vulnerable to suggestion by others that she become involved in this conspiracy; (vi) that many of her professional relationships had been damaged, and she had already lost her professional license and reputation because of this case; (vii) she is impoverished and disabled; (viii) the crime went on longer because she was emotionally unable to remove herself from the conspiracy; (ix) she accepted responsibility for her actions and was cooperative; (x) given her age and that she lost her license, additional prison time would not provide any greater deterrence to prevent her from repeating the crime; (xi) the Court could impose conditions of supervised release that would help

her with her mental health problems, which would put her under the federal court's supervision until she was in her mid-sixties; and (xii) the disparity between the Guidelines range for Vigil and the sentences received by her co-Defendants.  See Tr. at 69:12-74:8 (Court).  The Court also identified four factors that counseled against varying from the Guidelines: (i) a concern about deterring those in the community who would commit the same crime; (ii) sentencing parity between Vigil -- a medical professional who abused her trust to deal drugs -- and the broader mass of drug dealers in the community; (iii) prescription drugs are a serious problem in New Mexico, and Vigil's actions in exacerbating the drug problem were significant; (iv) and the overall seriousness of the crime.  See Tr. at 74:9-76:17 (Court).

In the Court's view, these factors justified varying downward the equivalent of about seven offense levels from a sentence equivalent to an offense level 29 to a sentence more in line with that given for an offense level 22, which would provide a Guideline range of 41-51 months of imprisonment.  See Tr. at 76:24-77:6.  Having considered the relevant factors, the Court imposed a sentence of 41 months.  See Tr. at 80:18-20.

## RELEVANT LAW REGARDING U.S.S.G. § 3B1.3

Section 3B1.3 of the United States Sentencing Guidelines, entitled "Abuse of Position of Trust or Use of Special Skill," provides:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels.  This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic.  If this adjustment is based upon an abuse of a position of trust, it may be employed in addition to an adjustment under § 3B1.1 (Aggravating Role); if this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under § 3B1.1 (Aggravating Role).

U.S.S.G. § 3B1.3. Section 3B1.3's "'primary concern . . . is to penalize defendants who take advantage of a position that provides them freedom to commit or conceal a difficult-to-detect wrong.'"  United States v. Guidry, 199 F.3d at 1159 (quoting United States v. Koehn, 74 F.3d 199, 201 (10th Cir. 1996)).

      1.    **Abuse-of-Trust Enhancement.**

To establish abuse of a position of trust for purposes of § 3B1.3's 2-level upward adjustment, the United States must establish: (i) "the person occupies a position of trust," and (ii) "the position of trust was used to facilitate significantly the commission or concealment of the crime."  United States v. Spear, 491 F.3d 1150, 1153 (10th Cir. 2007)(citing, among other cases, United States v. Morris, 286 F.3d 1291, 1295 (11th Cir. 2002)).   The Sentencing Guidelines' Application Note 1 to § 3B1.3 provides the definition for a position of trust:

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference).  Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.  For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult).

U.S.S.G. § 3B1.3 cmt. n.1.  The Tenth Circuit has noted: "Our cases interpreting the guideline make clear that the term 'position of trust' is a bit of a misnomer.  It actually has little to do with trustworthiness and everything to do with authority and discretion."  United States v. Spear, 491 F.3d at 1154 (emphasis in original).

The first prong of § 3B1.3's abuse-of-trust enhancement test analyzes whether the person occupies a position of trust in relation to the offense's victim.  The Tenth Circuit has noted that "[t]he question of whether an individual occupied a position of trust is evaluated from the

victim's perspective."  United States v. Guidry, 199 F.3d at 1160.  Thus, "the position of trust

must be found in relation to the victim of the offense."   United States v. Guidry, 199 F.3d at

1160.  The Tenth Circuit has stated:

> We have applied § 3B1.3 in two types of cases: "The first is where the defendant
> steals from his employer, using his position in the company to facilitate the
> offense," and the "second is where a 'fiduciary or personal trust relationship
> exists' with other entities [not the employer], and the defendant takes advantage
> of the relationship to perpetrate or conceal the offense."

United States v. Guidry, 199 F.3d at 1160 (alterations in original)(quoting United States v.

Brunson, 54 F.3d 673, 677 (10th Cir. 1995)).  See United States v. Brunson, 54 F.3d at 677  ("In

the typical case where § 3B1.3 applies, the victim is a business and the defendant is an employee

who has taken advantage of the knowledge and responsibilities acquired by virtue of his or her

position within the company to embezzle or otherwise steal from the company.").

The Tenth Circuit's decision in United States v. Queen, 4 F.3d 925 (10th Cir. 1993), is

instructive in analyzing "whether an individual occupies a position of trust . . . from the

perspective of the victim."  4 F.3d at 929.  In United States v. Queen, the defendant was the

president of Queen Metals Exchange, Inc. ("QMX"), a corporation which mailed postcards to

individuals advertising itself as a brokerage firm specializing in precious metal and currency

accounts.  4 F.3d at 926.  When individuals would inquire about investing with QMX, a

company representative would represent that investors' money would be used to purchase

precious metals and currencies, that investors would receive a return between forty-three percent

and eighty-nine percent annually, that they would not lose money the first year, and that QMX

did not engage in futures and options trading.  See 4 F.3d at 926.  In reality, little of the

investors' money was used to purchase metals and currencies; rather, "a majority of investors'

funds were either dissipated in the commodity futures market or used for the defendant's own

personal expenses."  4 F.3d at 926.   The defendant pled guilty to wire fraud, and, at the

sentencing hearing, the district court rejected the government's suggested offense level and

instead adopted the USPO's recommendation for a 2-level upward adjustment under U.S.S.G.

§ 3B1.3 based on the defendant's abuse of a position of trust, "because of the existence of a

fiduciary relationship between Mr. Queen and his investors."  4 F.3d at 927 (internal quotation

marks and alterations omitted).   The defendant argued that he did not occupy a position of trust.

He asserted that "§ 3B1.3 only applies to individuals who occupy real positions of employment

within a business or organization that give rise to relationships of trust," and "that he did not

occupy a real position of trust because his asserted status as an investment advisor/broker was

part of the fraudulent misrepresentations he made to his victims."  United States v. Queen, 4 F.3d

at 928.  The Tenth Circuit noted that "[t]here is no question that, had the defendant actually been

an investment advisor/broker as he represented to his victims, he would have occupied a position

of trust under" the § 3B1.3 abuse-of-trust analysis at the time that the Tenth Circuit decided

United States v. Queen, as the analysis compared a defendant's duties with other employees.

4 F.3d at 929.  The test analyzed

> the extent to which the position provides the freedom to commit a difficult-to-
> detect wrong, and whether an abuse could be simply or readily noticed;
> defendant's  duties as compared to those of other employees; defendant's level of
> specialized knowledge; defendant's level of authority in the position; and the
> level of public trust.

4 F.3d at 928-29 (quoting United States v. Williams, 966 F.2d 555, 557 (10th Cir. 1992),

abrogated by regulation as recognized in United States v. Spear, 491 F.3d at 1154 n.2)).[5]  The

---

[5] It is not clear whether United States v. Williams' factor test reflects current law.  The
confusion centers on the effect of a 1993 amendment to the relevant Application Note, which
clarified the definition of "public or private trust."  United States v. Merriman, 647 F.3d 1002,
1006 n.1 (10th Cir. 2011).  For several years following the 1993 amendment, the Tenth Circuit
continued to quote United States v. Williams' factor test without questioning its validity.  See,
e.g., United States v. Haber, 251 F.3d 881, 891 (10th Cir. 2001)(Seymour, J., joined by Baldock,

J., and Lucero, J.)(quoting United States v. Williams' factor test).  In a 2007 opinion, however, the Tenth Circuit appeared to limit United States v. Williams:

> The government relies in part on our 1992 decision in United States v. Williams, 966 F.2d 555 (10th Cir. 1992), which identifies several factors to consider in applying the abuse of trust enhancement. That decision, however, predated the significant modifications in the explanatory Application Note that the United States Sentencing Commission adopted in 1993. See [United States v. ]Edwards, 325 F.3d [1184, 1188 (10th Cir. 2003)](recognizing that the new language in Application Note 1 "deliberately set the bar at a higher level"); [United States v. ]Reccko, 151 F.3d [29, 34 (1st Cir. 1998)](finding the amendments emphasized the existence of managerial discretion, thereby limiting the import of prior decisions defining position of trust); United States v. Smaw, 22 F.3d 330 (D.C. Cir. 1994)(explaining how 1993 amendments affected the definition and determination of a position of trust). In light of the 1993 amendments, Williams is of limited significance when evaluating § 3B1.3.

United States v. Spear, 491 F.3d at 1154 n.2 (Tymkovich, J., joined by Ebel, J., and Holmes, J.). In 2008, however, the Tenth Circuit cited United States v. Williams and United States v. Spear within the same paragraph, and quoted -- apparently with approval -- United States v. Williams' factor test:

> Grace argues that we should affirm the district court's refusal to apply the § 3B1.3 enhancement to him because he served in a ministerial capacity and lacked the necessary managerial discretion required by the guideline. This argument amounts to a claim that Grace did not occupy a position of trust. See United States v. Spear, 491 F.3d 1150, 1153-59 (10th Cir. 2007)(discussing the issue of whether a criminal defendant had enough authority to justify a § 3B1.3 enhancement as a challenge to whether that defendant occupied a position of trust). "Whether a defendant occupied a position of trust under USSG § 3B1.3 is generally a factual matter."  United States v. Haber, 251 F.3d 881, 890-91 (10th Cir. 2001).  "In making this determination, the district court may consider a number of factors, including: 'the extent to which the position provides the freedom to commit a difficult-to-detect wrong, and whether an abuse could be simply or readily noticed; defendant's duties as compared to those of other employees; defendant's level of specialized knowledge; defendant's level of authority in the position; and the level of public trust.'" Id. (quoting United States v. Williams, 966 F.2d 555, 557 (10th Cir. 1992)).

United States v. Gallant, 537 F.3d 1202, 1244 (10th Cir. 2008)(Briscoe, J., joined by Lucero, J., and joined as to the judgment by Tacha, J.).  In 2011, the Tenth Circuit reiterated United States v. Spear's rejection of United States v. Williams' factor test, again relying on the 1993 amendments to the Application Note, without citing United States v. Gallant.  See United States v. Merriman, 647 F.3d at 1006 n.1 (quoting United States v. Spear).

Although the factor test's status is unclear, the Court relies on that portion of United States v. Queen, which relies on the United States v. Williams factors, only for two limited

Tenth Circuit in United States v. Queen reasoned that, because United States v. Williams was

concerned with "penalizing defendants who take advantage of a position that provides them with

purposes: (i) to explain that the Court analyzes whether a person occupied a position of trust in relation to the offense's victim; and (ii) to explain why the Tenth Circuit would construe the definition of "victim" in § 3B1.3 broadly enough to encompass the community.  The Tenth Circuit in United States v. Spear and the change to the Guidelines did not alter that aspect of the Tenth Circuit's analysis in United States v. Queen or United States v. Williams.

The Court relies more heavily on United States v. Queen than on United States v. Williams, but it does so with the Tenth Circuit's apparent blessing.  No panel of the Tenth Circuit has questioned United States v. Queen's viability.  The Tenth Circuit has, instead, repeatedly relied on that case, both before and after it decided United States v. Spear.  See, e.g., United States v. Brunson, 54 F.3d 673, 677 (10th Cir. 1995); United States v. Chee, 514 F.3d 1106, 1118 (10th Cir. 2008).

The Tenth Circuit has not stated why United States v. Queen has remained immune from the criticism that two panels leveled at United States v. Williams.  There is, however, one possible justification: it appears that the result would have been same even if the Tenth Circuit had not applied the United States v. Williams factors, but instead looked to the post-1993 amendments to the Application Note.  United States v. Queen's reasoning was tethered to the fact that, if the defendant had been an investment advisor/broker, as he held himself out to be, he would  have had discretionary authority -- indeed, because he was his own employer, he was "subject to no internal supervision or authority."  United States v. Queen, 4 F.3d at 929.  That is, although other factors were present, it was central to United States v. Queen that the defendant had discretionary authority.  See 4 F.3d at 928-29.  Discretionary authority is, in turn, central to the Application Note's definition of "public or private trust" after the 1993 amendments.  As United States v. Spear explains:

> In defining a position of public or private trust, the Guidelines' Application Note 1 to § 3B1.3 provides that:
>
> > "Public or private trust" refers to a *position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)*.  Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.
>
> USSG § 3B1.3, cmt. n.1 (emphasis added).

United States v. Spear, 491 F.3d at 1153-54.  It appears, therefore, that the result in United States v. Queen would have been the same in the absence of an analysis of the United States v. Williams factors.  For that reason, at least the discretionary-authority line of reasoning from United States v. Queen appears to survive the post-1993 amendments to the Application Note.

Regardless of the explanation for the confusion in this area, in the end, because the Tenth Circuit considers United States v. Queen to remain good law, the Court will consider it good law as well until the Tenth Circuit says otherwise.

the freedom to commit a difficult-to-detect wrong," the focus should be on whether the victim

believes that the defendant holds such a position, rather than on whether the defendant is

employed in the position:

> In Williams, we indicated that a primary concern of § 3B1.3 is with penalizing defendants who take advantage of a position that provides them with the freedom to commit a difficult-to-detect wrong.  See also, [United States v. ]Fox, 999 F.2d 483, 486 [(10th Cir. 1993)]; United States v. Lieberman, 971 F.2d 989, 993 (3rd Cir. 1992)("[T]he primary trait that distinguishes a person in a position of trust from one who is not is the extent to which the position provides the freedom to commit a difficult-to-detect wrong.")(quoting United States v. Hill, 915 F.2d 502, 506 (9th Cir. 1990)[, analysis necessarily modified and undercut by change to U.S.S.G. as recognized in United States v. Contreras, 493 F.3d 1135 (9th Cir. 2010)]).  This focus suggests that the question of whether an individual occupies a position of trust should be addressed from the perspective of the victim. See United States v. Booth, 996 F.2d 1395, 1396 (2d Cir. 1993); United States v. Castagnet, 936 F.2d 57, 62 (2d Cir. 1991); United States v. Hill, 915 F.2d 502, 506 n.3 (9th Cir. 1990)[, analysis necessarily modified and undercut by change to U.S.S.G. as recognized in United States v. Contreras, 493 F.3d 1135 (9th Cir. 2010)]).   A defendant who convinces a third party that he occupies a formal position of trust may possess the same freedom to commit a difficult-to-detect crime as an individual who actually possesses such a position.  Indeed, in many situations the absence of any institutional constraints may provide a defendant who merely pretends to occupy a formal position of trust with even greater freedom to commit a difficult-to-detect wrong than his or her legitimate counterpart.

United States v. Queen, 4 F.3d at 929.

While United States v. Queen provides insight into how to analyze whether the defendant

holds a position of trust from the victim's perspective, the Tenth Circuit has not defined the

victim for § 3B1.3's purposes:

> The question of how broadly or narrowly the term 'victim' should be defined in relation to the position of trust held by the defendant was not raised at any point in this case.  Thus, we do not address the issue except to observe that it is a matter of dispute among the circuits.

United States v. Edwards, 325 F.3d 1184, 1188 n.1 (10th Cir. 2003)(citing, as an e.g. cite, United

States v. Guidry, 199 F.3d 1150, 1160 n.6 (1999)(discussing cases)). At the least, the term

applies to individuals, see e.g., United States v. Queen, 4 F.3d at 929, and to "entities" or businesses, e.g., United States v. Brunson, 54 F.3d at 677.

       **2.**      **Special Skill Enhancement.**

To apply § 3B1.3's enhancement for use of a special skill: "(i) the defendant must possess a special skill . . . ; and (ii) the defendant must use that skill . . . to significantly facilitate the commission or concealment of the offense."  United States v. Tilga, 824 F. Supp. 2d 1295, 1335 (D.N.M. 2011)(Browning, J.)(citing United States v. Burt, 134 F.3d 997, 998-99 (10th Cir. 1998)).  See United States v. Gandy, 36 F.3d 912, 916 n.2 (10th Cir. 1994)(stating that, for § 3B1.3's application to apply based on use of a special skill, "it must be shown not only that Defendant possessed a special skill, but also that he employed that special skill to facilitate the commission of his offense").  Application Note 4 defines special skill as "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts."  U.S.S.G. § 3B1.3 cmt. n. 4.  The Tenth Circuit has recognized that a defendant need "not complete formal educational or licensing requirements in order to possess a special skill."  United States v. Hinshaw, 166 F.3d 1222, 1999 WL 9762, at * 3 (10th Cir. Jan. 12, 1999)(unpublished table opinion).[6]  "A special skill may also come from experience or from

---

[6] United States v. Hinshaw is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

self-teaching." United States v. Tilga, 824 F. Supp. 2d at 1317 (citing United States v. Gandy, 36 F.3d at 914). To apply a U.S.S.G. § 3B1.3 enhancement, the skill "'must be more than the mere ability to commit the offense. . . . Nothing in the commentary suggests that § 3B1.3 applies to a criminal who . . . bones up on the tricks of his trade and becomes adept at committing a crime that the general public does not know how to commit.'" United States v. Burt, 134 F.3d 997, 999 (10th Cir. 1998)(quoting United States v. Young, 932 F.2d 1510, 1513 (D.C. Cir. 1991)). Additionally, there must be a "connection between the crime and the Defendant's special knowledge." United States v. Burt, 134 F.3d at 1000.

In United States v. Tilga, a husband and wife -- Tilga and Chandler -- pleaded guilty to conspiring to impede the tax laws' administration by using multiple overseas trusts, which they purchased at special instructional seminars, to manage the wife's Internet business, the couple's homes, and their vehicles, and to evade reporting the family's income to the Internal Revenue Service. See 824 F. Supp. 2d at 1299. The Court noted that the PSR "seems to suggest that Tilga possessed two sets of special skills that she brought to bear in the commission of her offense: (i) business skills acquired in the course of her education; and (ii) skills related to [the use of the overseas trusts] acquired during . . . seminars." 824 F. Supp. 2d at 1335. With regard to the business skills acquired during her education, including a bachelor's degree in Hotel Administration from Cornell University and a Master's in Business Administration from the Wharton Business School at the University of Pennsylvania, the Court concluded that there was an insufficient nexus between her business skills and the tax evasion: "The skills she acquired over the course of her education . . . were not tax specific, and related to marketing and

---

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court finds that United States v. Hinshaw and United States v. Hopkins, No. 11-2114, slip op., 2013 WL 425980 (10th Cir. Feb. 5, 2013)(unpublished), have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

collecting fees for services provided.  There is no evidence that Tilga used the business and

marketing skills that she acquired during her education to significantly facilitate the concealment

of her crime."  824 F. Supp. 2d at 1335 (internal citations omitted).  As to whether the skills

acquired at the seminars were "special skills" within § 3B1.2's purview, the Court concluded

that, "even if Tilga or Chandler possessed specialized skills, it does not appear that either used

them to commit the crime," reasoning that the company which provided the instructional

seminars "exercised its skills to create the means for their offenses, and Tilga and Chandler

followed their program."  824 F. Supp. 2d at 1336.  The Court noted that, "generally, attending a

few seminars would not appear to be comparable to a skill requiring 'substantial education,

training or licensing,'"  824 F. Supp. 2d at 1335 (emphasis in original)(quoting U.S.S.G. § 3B1.3

cmt. n.4), and reasoned that the couple did not use any special skills beyond those that any

member of the public attending these seminars and purchasing the trusts would have acquired:

> At the hearing, Chandler stated that "CTC[7] held Tilga's hand throughout the time
> period" and was involved in the administration of Tilga's trusts.  Tilga also asserts

---

[7] CTC is an abbreviation for the Commonwealth Trust Company.  The Court explained in
its decision: "The CTC was an organization that taught individuals how to purchase and manage
Pure Trust Organizations ('PTOs')."  United States v. Tilga, 824 F. Supp. 2d at 1300.  With
regard to PTOs, the Court noted:

> The PSR notes:
>
> > A Pure Trust Organization (PTO) has been defined as a common
> > law contract in trust form. The Pure Trust is a contract at common-
> > law in equity created in trust form. Unlike the Trust, the PTO
> > receives the assets by exchange, meaning there is a full and
> > adequate exchange for the assets. In other words each party gives
> > something and receives something in return, and the agreement has
> > a stipulated duty to perform that all parties must adhere to. The
> > Exchanger exchanges the assets to the Trust for Trust Certificate
> > Units ("TCU's"). The Creator appoints at least two Trustees to
> > manage the trust. The Trustees can appoint a General Manager to
> > oversee the day-to-day business activities of the Trust. The
> > Exchanger has no control over the Trustees, the business of the
> > Trust or the income stream. The Trustees are in total control and

- 31 -

that she accepted the representations of CTC's sales personnel, lawyers, and accountants, and did no more than purchase CTC products. CTC conducted seminars on a variety of topics, including the "use of trustee documents, privacy issues, offshore banking, certificate holder issues, how to wire transactions to offshore accounts and where to store documents." While these seminar topics conveyed specialized knowledge, there is no evidence that participants were taught specialized skills not possessed by members of the general public, as § 3B1.3 requires. More likely is that participants walked away from these seminars with a general understanding of the topic, which may be more than what the public knows, but which still does not rise to the level of a specialized skill. Although Tilga and Chandler used sophisticated programs, offshore accounts, and other entities, as discussed above in reference to the sophisticated-means enhancement, there is no evidence that Tilga or Chandler possessed any special skills related to the creation or operation of the PTOs. Furthermore, even if Tilga or Chandler possessed specialized skills, it does not appear that either used them to commit the crime, because CTC exercised its skills to create the means for their offenses, and Tilga and Chandler followed their program.

824 F. Supp. 2d at 1335-36 (internal citations omitted).

The Tenth Circuit, in <u>United States v. Gandy</u>, remanded the case to the district court, concluding that the district court failed to adequately explain the nexus between the defendant doctor's special skill and how the special skill facilitated the offense -- fraudulently stating on Medicare forms that he performed surgery when, in reality, the services were routine foot care services. <u>See</u> 36 F.3d at 912. The Tenth Circuit recognized that, "[i]f the government does not show that the defendant employed his skill to facilitate the commission of his offense, then the court may not properly enhance the defendant's sentence under § 3B1.3." 36 F.3d at 915. The Tenth Circuit "first note[s] that the fact that Defendant possessed a special skill -- podiatry -- is

---

the Exchanger has no reversionary interest in the Trust. This entity has the substance of a contract and the form of a trust.

Tilga PSR ¶ 10, at 7–8. The IRS states that the term "pure trust" does not appear in the Internal Revenue Code and that "[w]hatever the name of the arrangement . . . the taxation of the entity must comply with the requirements of the Internal Revenue Code." Abusive Trust Tax Evasion Schemes—Special Types of Trusts, Internal Revenue Service . . . .

824 F. Supp. 2d at 1300 n.7.

undisputed." 36 F.3d at 915.  The Tenth Circuit also noted that the doctor "used his podiatric

skill to defraud the United States.  If he hadn't had [this special skill of podiatry] no fraud could

have been committed by him."  36 F.3d at 915 (quoting the trial record).  The Tenth Circuit

concluded, however, that the district court's conclusion, without explaining how the "Defendant

did in fact use his podiatric skill to facilitate the commission of his offense," was insufficient.  36

F.3d at 915.  Similar to the Court's conclusion in United States v. Tilga that there not a sufficient

nexus between any specialized skill which the defendant may have garnered through her

education in marketing and the tax evasion scheme for which she was convicted, the Tenth

Circuit noted: "[Neither] the court's finding [nor anything in the record] . . . specifically explain

how Defendant used his podiatric skill -- i.e., such as if Defendant had used his diagnostic skills

as a podiatrist in some way to falsify the claim forms and the operative reports."  United States v.

Gandy, 36 F.3d at 916 (internal footnote omitted).  The Tenth Circuit pointed out that possession

of a special skill without more is insufficient for § 3B1.3's enhancement:

> We note that the court's finding is problematic for another reason.  The court's
> statement that "[i]f [Defendant] hadn't had [his skill] no fraud could have been
> committed by him," seems to suggest that because Defendant is a podiatrist, *a
> fortiori* he used his special skill in the commission of his offense.  As we have
> already explained, however, it must be shown not only that Defendant possessed a
> special skill, but also that he employed that special skill to facilitate the
> commission of his offense.

United States v. Gandy, 36 F.3d at 916 n.2 (alterations in original).

## LAW REGARDING U.S.S.G. § 3B1.1 AGGRAVATING ROLE ENHANCEMENTS

Section 3B1.1 of the Sentencing Guidelines provides for enhancements to a defendant's

offense level based on a defendant having played an aggravating role in the offense.

Section 3B1.1 of the Sentencing Guidelines provides:

> Based on the defendant's role in the offense, increase the offense level as follows:

**(a)** If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

**(b)** If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

**(c)** If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

U.S.S.G. § 3B1.1.  "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted."  U.S.S.G. § 3B1.1 cmt. n.1.

Among the factors a sentencing court should consider when weighing an aggravating role enhancement are:

[T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

U.S.S.G. § 3B1.1, cmt. n.4.  The Tenth Circuit has "elaborated that '[i]n considering these factors, the sentencing court should remain conscious of the fact that the gravamen of this enhancement is control, organization, and responsibility for the actions of other individuals because § 3B1.1(a) is an enhancement for organizers or leaders, not for important or essential figures.'"  United States v. Sallis, 533 F.3d 1218, 1223 (10th Cir. 2008)(quoting United States v. Torres, 53 F.3d 1129, 1142 (10th Cir. 1995)).  "[A] defendant's participation in illegal but lower-level activities," however, "will not support application of the enhancement."  United States v. Sallis, 533 F.3d at 1223.  Nevertheless, "[a] defendant may be eligible for the leader or organizer

enhancement if he leads or organizes even one other participant."   United States v. Damato, 672

F.3d 832, 847 (10th Cir 2012.), cert. denied, 133 S. Ct. 319 (2012).

> The Tenth Circuit, in the context of conspiracies to distribute illegal drugs, has also
>
> identified several factors which might indicate that a defendant exercised the
> requisite control over others, including that: other sellers worked for him, were
> recruited by him, or had their activities controlled by him; "he paid others for
> their efforts on behalf of the conspiracy;" "he restricted the people to whom other
> coconspirators could sell their drugs;" and "he controlled the manner of sales, set
> prices, or claimed the right to a larger share of proceeds." United States v.
> Anderson, 189 F.3d 1201, 1212 (10th Cir. 1999); see also United States v.
> Massey, 48 F.3d 1560, 1572 (10th Cir. 1995)(listing similar factors).

United States v. Sallis, 533 F.3d at 1223.   "[A] 'role as a supplier of drugs to others, standing

alone, is not enough' to justify a leader enhancement" under § 3B1.1, nor is "supplying drugs on

credit, or fronting, without more."   United States v. Sallis, 533 F.3d at 1223-24 (quoting United

States v. Anderson, 189 F.3d at 1212 and citing United States v. Owens, 70 F.3d 1118, 1129

(10th Cir. 1995)).

"A two-level adjustment under § 3B1.1(c) applies whenever 'the defendant was an

organizer, leader, manager, or supervisor in any criminal activity [involving less than five

participants and that is not otherwise extensive].'"   United States v. Wardell, 591 F.3d 1279,

1304 (10th Cir. 2009)(alterations in original)(quoting U.S.S.G. § 3B1.1(c)).   See United States v.

Tilga, 824 F. Supp. 2d at 1319 n.12 (Browning, J.)("Section 3B1.1(c) applies to leaders,

organizers, managers, or supervisors of organizations with less than five persons.   The only

relevant difference between an organizer under § 3B1.1(a) and an organizer under § 3B1.1(c), it

seems, is the size of the organization.").   "In assessing whether an organization is 'otherwise

extensive,' all persons involved during the course of the entire offense are to be considered."

U.S.S.G. § 3B1.1 cmt. n.3.   "The [Sentencing] Commission's intent is that this adjustment

should increase with both the size of the organization and the degree of the defendant's responsibility." U.S.S.G. § 3B1.1, background.

While there is overlap between the activities that would make a defendant a leader and those that would make a defendant an organizer, the two are distinct. "Functioning as a leader requires an element of control over underlings, particularly in the form of recruitment and direction. To qualify as an organizer, however, no control is necessary." United States v. Wardell, 591 F.3d at 1304 (citations omitted)(citing United States v. Cruz Camacho, 137 F.3d 1220, 1224-25 (10th Cir. 1998); United States v. Egbert, 562 F.3d 1092, 1103 (10th Cir. 2009)). The Tenth Circuit has recognized that, as a result of the Commission's inclusion of managers or supervisors along with organizers in § 3B1.1(c), "a defendant may be punished as an organizer under § 3B1.1(c) for devising a criminal scheme, providing the wherewithal to accomplish the criminal objective, and coordinating and overseeing the implementation of the conspiracy even though the defendant may not have any hierarchical control over the other participants." United States v. Valdez-Arieta, 127 F.3d at 1272. Thus, "'[t]he key to determining whether a defendant qualifies as an organizer is not direct control but relative responsibility.'" United States v. Wardell, 591 F.3d at 1304 (quoting United States v. Tejada-Beltran, 50 F.3d at 112).

## ANALYSIS

Vigil argues that her "criminal conduct did not involve any abuse of the public trust, as contemplated by the sentencing guidelines, but rather involved the use of her special skill as a nurse with prescription writing authority." Objections at 4. She asserts that, because any U.S.S.G. § 3B1.3 adjustment would be based on abuse of a special skill, and because § 3B1.3 provides that an adjustment based on abuse of a special skill cannot, under U.S.S.G. § 3B1.1, be applied in addition to an aggravating role adjustment, her offense level must be reduced. The

Court disagrees with Vigil's logic, however, and concludes that the USPO correctly applied both the § 3B1.1 aggravating role adjustment and the § 3B1.3 abuse-of-trust adjustment, as Vigil abused a position of public trust in the offense's commission.

**I.      VIGIL USED A SPECIAL SKILL TO FACILITATE THE OFFENSE'S COMMISSION.**

Because Vigil contends that her criminal conduct "involved the use of her special skill as a nurse with prescription writing authority," the Court will analyze first whether the USPO's inclusion of a two-level adjustment under § 3B1.3 is consistent with her contention.  Application of § 3B1.3's adjustment for use of a special skill requires the United States to prove two components: "(i) the defendant must possess a special skill . . . ; and (ii) the defendant must use that skill . . . to significantly facilitate the commission or concealment of the offense."  United States v. Tilga, 824 F. Supp. 2d at 1335.  Vigil's contention that her position "as a nurse with prescription writing authority" is a special skill, Objections at 4, is compatible with the Commission's language in Application Note 4.

The Commission in § 3B1.3's Application Note 4 provides the listed professions only as examples of "[s]pecial skills" rather than listing the professionals' particular skills.  U.S.S.G. § 3B1.3 cmt n.4 ("'Special skill' refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing.  Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts.").  In reality, however, membership in a profession cannot be either necessary or sufficient to establish that "the defendant . . . possess a special skill" for § 3B1.3's purposes.  United States v. Tilga, 824 F. Supp. 2d at 1335.  To conclude otherwise is incompatible with Tenth Circuit precedent.  First, the Tenth Circuit has recognized that a defendant need "not complete formal educational or licensing requirements in order to possess a special skill," United States v. Hinshaw, 1999 WL

9762, at *3, and that "[a] special skill may also come from experience or from self-teaching," United States v. Tilga, 824 F. Supp. 2d at 1317 (citing United States v. Gandy, 36 F.3d at 914). The Tenth Circuit rather has construed § 3B1.3 to require that the "defendant . . . possess a special skill" and not that the defendant be in a profession which requires special skills for membership.  United States v. Hinshaw, 1999 WL 9762, at *3.  Nevertheless, the Court finds that, like "pilots, lawyers, doctors, accountants, chemists, and demolition experts," who possess "a skill not possessed by members of the general public, usually requiring substantial education, training, or licensing," U.S.S.G. § 3B1.3 cmt. n.4, nurse practitioners also possess skills not possessed by members of the general public and usually requiring substantial education, training, or licensing.  Indeed, New Mexico law provides for a board licensure procedure certifying nurse practitioners who successfully complete a specialized exam and a "program for the education and preparation of nurse practitioners," among other requirements.  N.M. Stat. Ann. § 61-3-23.2. Accordingly, as the Tenth Circuit in United States v. Gandy noted that it was undisputed "that Defendant possessed a special skill -- podiatry," 36 F.3d at 15, here, the Court and the United States do not dispute that Vigil possesses a special skill as a nurse practitioner.

Another skill is Vigil's "prescription writing authority," Objections at 4, which is a "special skill," beyond those skills that members of the general public possess, which enabled Vigil "to significantly facilitate the commission or concealment of the offense," United States v. Tilga, 824 F. Supp. 2d at 1335.  See N.M. Stat. Ann. § 61-3-23.2 (permitting certified nurse practitioners to "prescri[be] and distribut[e] . . . dangerous drugs and controlled substances included in Schedules II through V of the Controlled Substances Act").  In United States v. Tilga, because Tilga was convicted of tax fraud, her MBA in hospitality did not constitute a "special skill" which facilitated the commission or concealment of the offense under § 3B1.3.

More important for Vigil's argument, the Tenth Circuit in United States v. Gandy found that,

although the defendant had the special skill of podiatry, there was no specific explanation how

"he used his podiatric skill -- i.e., such as if Defendant had used his diagnostic skills as a

podiatrist in some way to falsify the claim forms and the operative reports" in committing

Medicare fraud.  36 F.3d at 916.

Vigil's ability to write prescriptions is what the Tenth Circuit found lacking in United

States v. Grandy: she "[mis]used [her] skills as a [nurse practitioner] in some way to falsify the"

prescriptions and the patients records to deal them drugs.  36 F.3d at 916.  The Court therefore

concludes that § 3B1.3's application was properly based on Vigil's use of a special skill, as there

is sufficient evidence to find the required nexus between Vigil's special skill as a nurse with

prescription writing authority and commission of the drug-trafficking offense for which she was

convicted.

## II.    THE COURT CONCLUDES THAT THE USPO PROPERLY APPLIED § 3B1.3'S 2-LEVEL ADJUSTMENT BASED ON VIGIL'S ABUSE OF A POSITION OF PUBLIC TRUST.

Vigil asserts that she "did not abuse the public trust as that phrase is used under the

guidelines," arguing:

> [I]mportantly, the comment to § 3B1.3 shows that an abuse of the public trust
> happens when a relationship of trust between two individuals is used to harm a
> specific person, such as an attorney embezzling a client's funds, or the sexual
> abuse of a patient by a doctor who is faking a medically necessary examination.

Objections at 5 (citing U.S.S.G. § 3B1.3 cmt. n.1.).  The United States responds that Vigil's

contention is contrary to established law and lacks support in precedent, as "several cases have

held that prescription writing authority constitutes a public trust and that adjustments for

unlawful issuance of prescriptions relate to an abuse of that trust."  Response at 4 (citing United

States v. Louis, 559 F.3d at 1225; United States v. Shinderman, 474 F. Supp. 2d at 184).  The

- 39 -

Court agrees with the United States that Vigil's position as a nurse practitioner with prescription writing authority is a position of public trust, which she abused by writing false prescriptions.

To establish abuse of a position of trust for purposes of § 3B1.3's two-level upward adjustment, the government must establish: (i) "the person occupies a position of trust," and (ii) "the position of trust was used to facilitate significantly the commission or concealment of the crime." United States v. Spear, 491 F.3d at 1153. A position of "public or private trust is 'characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference).'" United States v. Merriman, 647 F.3d 1002, 1005 (10th Cir. 2011). The Tenth Circuit has noted: "Our cases interpreting the guideline make clear that the term 'position of trust' is a bit of a misnomer. It actually has little to do with trustworthiness and everything to do with authority and discretion." United States v. Spear, 491 F.3d at 1154 (emphasis in original).

### A.   SECTION 3B1.3'S ENHANCEMENT CAN BE PREMISED BOTH ON USE OF A SPECIAL SKILL AND ABUSE OF A POSITION OF TRUST.

Vigil reads § 3B1.3's enhancement to be exclusive: if the enhancement is based on abusing a special skill, it cannot also be based on abusing a position of trust. Section 3B1.3's plain language, and precedent which Vigil cites to the Court, reveal otherwise. First, § 3B1.3's language cuts against Vigil's position, as it says that, if the application "is based solely on the use of a special skill," § 3B1.1's aggravated role enhancement cannot also apply. U.S.S.G. § 3B1.3 (emphasis added). If, however, § 3B1.3's enhancement "is based upon an abuse of a position of trust," § 3B1.1's enhancement can also be applied. U.S.S.G. § 3B1.3. Thus, if the two applications were mutually exclusive, the Guidelines' use of the word "solely" would be superfluous, and the Court cannot read the Commission's language out of the provision. Cf. United States v. Ganadonegro, 854 F. Supp. 2d 1068, 1081 (D.N.M. 2012) (Browning,

J.)("Courts must strive to interpret a statute so that it gives every word in that statute operative effect.")(citing United States v. Nordic Vill., Inc., 503 U.S. 30, 35 (1992)).   Second, an unpublished opinion from the United States Court of Appeals for the Sixth Circuit, United States v. Sawaf, 129 F. App'x 136 (6th Cir. 2005), which Vigil cites to the Court in support of her position that "a medical doctor's prescription writing authority was 'a special skill,'" Objections at 6, also supports this interpretation.   The Sixth Circuit, in affirming the district court's application of the 2-level enhancement, points out in United States v. Sawaf that "[t]he district court found that Defendant abused both his position of trust and his special skill and enhanced his sentence under § 3B1.3." 129 F. App'x at 145 (emphasis added).   Here, given the plain language of § 3B1.3's aggravated role enhancement, the sentence can be based both on use of a special skill and abuse of a position of trust, but not solely on the use of a special skill.

> **B.**     **THE LACK OF AN IDENTIFIABLE VICTIM DOES NOT PRECLUDE § 3B1.3'S APPLICATION FOR ABUSE OF A POSITION OF TRUST, BECAUSE THE COMMUNITY IS THE VICTIM OF VIGIL'S DRUG-TRAFFICKING OFFENSE.**

As Vigil correctly points out, the Tenth Circuit has held that the question whether a defendant occupies a position of trust "must be found in [view of the defendant's] relation to the victim of the offense."   United States v. Guidry, 199 F.3d at 1160.  Her contention is that, "[h]ere, there is no victim," because the PSR does not apply a victim-related adjustment, and because the PSR concludes that there is no "identifiable victim" to whom any restitution could be paid.  Although the Tenth Circuit has not answered "[t]he question of how broadly or narrowly the term 'victim' should be defined in relation to the position of trust held by the defendant," United States v. Edwards, 325 F.3d at 1188 n.1, the Court concludes that victim should be construed broadly enough to cover the community as the victim of Vigil's drug-trafficking offense.

The lack of an identifiable victim does not equate to the lack of a victim, and thus does not preclude § 3B1.3's application for abuse of a position of trust.  Both Congress and the Court have recognized that the whole community is the victim of drug-trafficking activities.  Cf. United States v. Hernandez-Mejia, CR 05-0469 JB, 2009 WL 1291149, at *4 n.2 (D.N.M. Jan. 12, 2009)(Browning, J.)(noting that "the Court has discretion to impose restitution for harm to the community for drug-trafficking," in light of "18 U.S.C. § 3663(c)(1) []stating that 'when sentencing a defendant convicted of an offense described in . . . the Controlled Substances Act (21 U.S.C. §§ 841, 848(a), 849, 856, 861, 863), in which there is no identifiable victim, the court may order that the defendant make restitution'").  The Tenth Circuit has similarly pointed out that a "sentencing judge's statement about harm to the community resulting from drug dealers' activities properly emphasized the [offense's] seriousness." United States v. Roth, 934 F.2d 248, 253 (10th Cir. 1991)(citing United States v. Torres, 901 F.2d 205, 246-47 (2d Cir. 1990), abrogated on other grounds by United States v. Marcus, 628 F.3d 36 (2d Cir. 2010)).

At the same time that the Tenth Circuit observed in United States v. Edwards that it has not answered the question how broadly the term victim should be construed for § 3B1.3's purposes, it noted that restitution was sufficient to find that the case involved a victim.  See 325 F.3d at 1184 n.1 ("In any event, the judgment in this case specifically included an amount of restitution to Bowlin, as well as restitution to the bank, leaving no doubt that both were victimized on a quantifiable basis.").  Notably, in drug-trafficking cases, Congress specifically allows for restitution when there is no identifiable victim.  See 18 U.S.C. § 3663(c)(1) ("Notwithstanding any other provision of law . . . when sentencing a defendant convicted of an offense described in section 401, 408(a), 409, 416, 420, or 422(a) of the Controlled Substances Act  . . . in which there is no identifiable victim, the court may order that the defendant make

restitution . . . ."). Just as the Tenth Circuit in United States v. Edwards ordered that restitution was sufficient to find that there was a victim despite that it had not answered how broadly "victim" may be construed, the Court here concludes that Congress' provision for restitution in drug-trafficking offenses where there is no identifiable victim is sufficient to find that the Tenth Circuit would construe "victim" to include the greater community in drug-trafficking cases such as this case. Thus, the absence of an identifiable victim does not preclude § 3B1.3's application to Vigil for abuse of a position of trust, because the community was a victim of her drug-trafficking offense, carried out by false prescriptions.

The case in which the Tenth Circuit first announced that whether a defendant held a position of trust should be viewed from the victim's perspective, United States v. Queen, supports the conclusion that the Tenth Circuit would construe the definition of victim for § 3B1.3's purposes broadly enough to encompass the community, because the Tenth Circuit applied this rule to broaden the scope of defendants to whom § 3B1.3's abuse-of-trust test would apply. In United States v. Queen, the defendant, who held himself out as an investment advisor/broker although he was not one, contended that, in light of the fact that one component of the Tenth Circuit's § 3B1.3 abuse-of-trust enhancement test considers the "defendant's duties as compared to those of other employees," the adjustment could not apply to him. 4 F.3d at 928-29. The Tenth Circuit pointed out: "There is no question that, had the defendant actually been an investment advisor/broker as he represented to his victims, he would have occupied a position of trust under the Williams criteria," because "[a]n investment advisor/broker typically is an individual who is entrusted with the discretionary authority to manage the assets of his or her clients . . . [and is thus] positioned to commit a difficult-to-detect wrong." United States v. Queen, 4 F.3d at 929 (citing United States v. Williams, 966 F.2d at 558). Moreover, the Tenth

Circuit noted that "[t]his is especially true where the investment advisor/broker is his own employer, as Queen was in this case, and is therefore subject to no internal supervision or authority."  4 F.3d at 929.  There was therefore no dispute that the investment advisor/broker position which he held himself out as "holding . . . contributed in some significant way to facilitating the commission of the offense," and that the fact that he owned the business and represented to the victims that he would invest their money for them "contributed in some significant way to . . . [the] concealment of the offense."  U.S.S.G. § 3B1.3 cmt. n.1.  The Tenth Circuit therefore concluded that, because necessary to the defendant's commission of the crime was inducing his victims to believe that he was an investment advisor/broker, which, if he actually was, would have made § 3B1.3's abuse-of-trust adjustment beyond question, to focus the question on whether the defendant holds a position of trust from the victim's point of view, rather than whether the defendant is actually employed in the position, furthers the Sentencing Commission's policy underlying § 3B1.3's adjustment in penalizing persons whose position, whether actual or only in their victim's belief, contributes significantly to the commission or concealment of the crime.

United States v. Queen does not, therefore, provide support for Vigil's argument that, because the PSR observes that Vigil's "offense has no identifiable victim," PSR ¶ 114, at 28, "the abuse of trust adjustment cannot apply," Objections at 5.  Rather, the Tenth Circuit's recognition that the "question of whether an individual occupied a position of trust is evaluated from the victim's perspective," 4 F.3d at 929, can rather be seen as construing the question whether the defendant occupied a position of trust -- a position "characterized by professional or managerial discretion . . . . [,] positions ordinarily . . . subject to significantly less supervision," U.S.S.G. § 3B1.3 cmt. n.1 -- as an inquiry into whether the victim could "objectively . . . believe

that the defendant occupied [the] formal position of trust with regard to them." <u>United States v.</u>
<u>Queen</u>, 4 F.3d at 930.

Recognizing that the question whether the defendant occupied a position of trust should
be addressed from the victim's perspective is the practical equivalent of analyzing whether a
person would objectively believe that the defendant held a position of trust.  The first point arises
from the cases in which § 3B1.3's adjustment has generally been applied. As the Tenth Circuit
has pointed out, § 3B1.3's adjustment has generally been applied in two situations:

> "The first is where the defendant steals from his employer, using his position in
> the company to facilitate the offense," and the "second is where a 'fiduciary or
> personal trust relationship exists' with other entities [not the employer], and the
> defendant takes advantage of the relationship to perpetrate or conceal the
> offense."

<u>United States v. Guidry</u>, 199 F.3d at 1160 (alterations in original)(quoting <u>United States v.</u>
<u>Brunson</u>, 54 F.3d at 677).  In the first situation, in which the defendant steals from an employer,
a factual scenario similar to that of <u>United States v. Queen</u> is likely not to arise, as an employer
cannot likely be induced to believe a person holds a position of managerial discretion within its
business when the employer does not employ that person.  Thus, the question whether "an
individual who merely pretends to occupy a position of trust is not subject to § 3B1.3 because
this section only applies to individuals who actually occupy formal positions of employment" is
likely never to become an issue when the defendant is not an employee of the victim.  <u>United</u>
<u>States v. Queen</u>, 4 F.3d at 929.  In the second situation, however, as <u>United States v. Queen</u>
evinces, a fiduciary or personal trust relationship of which the defendant can take advantage can
exist by the defendant feigning the relationship.  Thus, in light of the second situation arising
without requiring that the defendant be employed in a position of trust, focusing the inquiry on
whether, from the victim's perspective, the victim had with the defendant a "fiduciary or

- 45 -

personal trust relationship," <u>United States v. Guidry</u>, 199 F.3d at 1160, effectuates § 3B1.3's plain language to punish an "abuse of position of trust" and not an abuse of employment in a position of trust.  U.S.S.G. § 3B1.3.  Here, the lack of identifiable victims does not preclude application of § 3B1.3's enhancement for abuse of a position of trust, because in drug-trafficking cases, the community can be the victim.

C.    **UNDER THE FIRST PRONG OF § 3B1.3'S ABUSE-OF-TRUST TEST, VIGIL HELD A POSITION OF TRUST IN HER POSITION AS A NURSE PRACTITIONER AND AS OWNER/OPERATOR OF CLINICA DE LA GLORIA, BECAUSE SHE HAD SUBSTANTIAL DISCRETION AND AUTHORITY.**

The § 3B1.3 abuse-of-trust test's first prong looks at whether the defendant holds a position of public or private trust, which is "'characterized by professional or managerial discretion (<u>i.e.</u>, substantial discretionary judgment that is ordinarily given considerable deference).'"  <u>United States v. Merriman</u>, 647 F.3d at 1005 (U.S.S.G. § 3B1.3 cmt. n.1).  The Tenth Circuit has noted that whether the defendant holds a position of trust turns on the defendant's authority and discretion in his or her position:

> In defining a position of public or private trust, the Guidelines' Application Note 1 to § 3B1.3 provides that:
>
>> "Public or private trust" refers to <u>a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)</u>. Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.
>
> U.S.S.G. § 3B1.3, cmt. n.1 (emphasis added).
>
> The commentary goes on to illustrate the scope of the adjustment -- it applies, for example, to professionals like lawyers or doctors, but not to bank tellers or hotel clerks.

> Our cases interpreting the guideline make clear that the term "position of trust" is a bit of a misnomer. It actually has little to do with <u>trustworthiness</u> and everything to do with <u>authority</u> and <u>discretion</u>.

<u>United States v. Spear</u>, 491 F.3d at 1153-54 (emphasis in original).

The Tenth Circuit concluded in <u>United States v. Queen</u> that the defendant in <u>United States v. Queen</u> abused a position of trust, because the position he induced his victims to believe that he held is "entrusted with the discretionary authority to manage the assets of his or her clients . . . [and is thus] positioned to commit a difficult-to-detect wrong . . . especially true where the investment advisor/broker is his own employer . . . and is therefore subject to no internal supervision or authority." 3 F.3d at 929. Vigil was a nurse practitioner and, combined with her nursing license and New Mexico Board of Pharmacy controlled substance license, had the authority to prescribe schedule II-V controlled substances. Moreover, as the owner/operator of Clinica De La Gloria, Vigil had the ultimate managerial discretion in her position, and was "subject to no internal supervision or authority." <u>United States v. Queen</u>, 4 F.3d at 929. Application Note 1 contrasts "the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination," as situations in which the requisite discretion and authority are present, with those of "embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by" the same level of authority or discretion. A nurse employed in a doctor's office or hospital may, depending on the circumstances, be more analogous to a bank teller or a clerk rather than a bank's chief executive officer, but Vigil as the owner and operator of Clinica De La Gloria, writing prescriptions in her own name, had at least as much authority or discretion as an attorney, a bank's chief executive officer, or a physician would. Case law supports finding that a defendant with prescription-

writing authority is in a position of trust for § 3B1.3's abuse-of-trust adjustment's purposes.  See United States v. Sipsy, 287 F. App'x at 272 (upholding application of § 3B1.3's abuse-of-trust enhancement to a physician who had written false prescriptions to others, who filled them and returned the drugs to the physician for his own use); United States v. McCollister, 96 F. App'x 974, 975-76 (6th Cir. 2004)(unpublished)(upholding § 3B1.3's abuse-of-trust enhancement's application to a physician who provided for a fee "fraudulent prescriptions for painkilling medication using the names of former or current patients and deceased or fictitious people,"); United States v. Hoffer, 129 F.3d 1196, 1205 (11th Cir. 1997)(upholding district court's application of § 3B1.3's adjustment for abusing position of public trust, because the defendant physician, convicted of conspiracy to distribute and dispense controlled substances based on an arrangement where the defendant would write false prescriptions to drug dealers who would pay the defendant half of the proceeds, "betrayed society's trust by using his prescription writing privileges to distribute controlled substances outside the legitimate practice of medicine").

As the Tenth Circuit requires the question whether the defendant held a position of trust to be answered from the victim's viewpoint, because the victim of Vigil's crime is the greater community, because Vigil's license gave her the authority and discretion to write prescriptions which she abused by writing false prescriptions, and because the New Mexico community entrusted her with that discretion by granting her the license to prescribe controlled substances, Vigil held a position of trust from the victim's perspective.  See United States v. Broderson, 67 F.3d 452, 456 (2d Cir. 1995)(holding that an upward adjustment for abuse of a position of trust requires that "the discretion must be entrusted to the defendant by the victim").  In United States v. Barakat, 130 F.3d 1448 (11th Cir. 1997), the United States Court of Appeals for the Eleventh Circuit disapproved of the rule that an abuse of trust requires that the victim place his or her trust

in the defendant on the basis that the rule may not cover situations in which a physician abuses

his or her power to write controlled substances prescriptions:

> In <u>United States v. Broderson</u>, 67 F.3d 452, 456 (2d Cir. 1995), the Second
> Circuit held that an enhancement for an abuse of trust requires that the discretion
> or trust abused must have been placed with the defendant by the victim.  Because
> the defendant in <u>Broderson</u> was placed in a position of trust by his employer but
> not by the government, which was the entity victimized by his fraudulent
> statements, the § 3B1.3 enhancement was held not to apply.  <u>See</u> <u>id.</u> at 455-56.
> Although we do not quarrel with the result in <u>Broderson</u>, the rule stated in that
> opinion may be too broad. Under that statement of the rule, an enhancement for
> abuse of trust might be precluded where a doctor uses his professional position
> and medical license to violate the controlled substance law.  <u>Or perhaps the</u>
> <u>Second Circuit would hold that that scenario falls within the Broderson rule,</u>
> <u>because the victim in such a case is society as a whole, which has entrusted the</u>
> <u>doctor with his professional position and license</u>.  In any event, we have held that
> a § 3B1.3 enhancement is appropriate in such circumstances.

<u>United States v. Barakat</u>, 130 F.3d at 1454-55 (citing <u>United States v. Hoffer</u>, 129 F. 3d at

1196)(emphasis added).  The Court concludes that the Tenth Circuit would agree with the second

application of the <u>United States v. Broderson</u> rule, that, "because the victim in [Vigil's] case is

society as a whole, which has entrusted the [nurse practitioner] with [her] professional position

and license," she held a position of trust for § 3B1.3's purposes, and the Court therefore finds

that Vigil held a position of trust.

> ### D. UNDER THE SECOND PRONG OF § 3B1.3'S ABUSE-OF-TRUST TEST, VIGIL'S POSITION OF TRUST FACILITATED SIGNIFICANATLY THE OFFENSE, BECAUSE VIGIL'S POSITION OF TRUST AS A NURSE PRACTICITIONER WITH PRESCRIPTION-WRITING AUTHORITY MADE IT POSSIBLE FOR HER TO WRITE THE FALSE OXYCODONE PRESCRIPTIONS.

The § 3B1.3 abuse-of-trust test's second prong requires the Court to determine whether

"the position of trust was used to facilitate significantly the commission or concealment of the

crime."  <u>United States v. Spear</u>, 491 F.3d at 1153.  Vigil appears not to contest that her authority

to write prescriptions as a nurse practitioner licensed by the state to prescribe controlled

substances significantly facilitated the commission of her offense, because, in asserting that "the Court should recognize Defendant Vigil's conduct in writing illegitimate prescriptions for what it is -- using a special skill to commit a crime," Vigil concedes that she used her prescription-writing authority to carry out the offense.  Objections at 6.  Moreover, in the very next sentence, Vigil concedes that her prescription writing authority "facilitated the commission of this crime." Objections at 6 ("When the Court rightly considers that Defendant Vigil's special skill facilitated the commission of the crime . . . it is evidence that either one or the other adjustment [§ 3B1.1 or § 3B1.3] may apply, but not both." (emphasis added)).  Regardless whether Vigil so concedes, the Court independently concludes that her position of trust as a nurse practitioner with prescription writing authority significantly facilitated her drug-trafficking offense for writing false oxycodone prescriptions.

The Sixth Circuit in United States v. McCollister upheld application of § 3B1.3's abuse-of-trust adjustment to a defendant physician, noting that the physician "abused a position of trust because his professional role as practicing physician made it possible for him to write prescriptions for oxycodone and thus contributed significantly to his ability to commit the offense."  United States v. McCollister, 96 F. App'x at 976.  Similarly, in United States v. Hoffer, the Eleventh Circuit upheld § 3B1.3's abuse-of-trust adjustment to a defendant physician

> for using his special skills as a physician to facilitate the commission of his crimes
> and for abusing the position of trust he held as a physician.  Hoffer betrayed
> society's trust by using his prescription writing privileges to distribute controlled
> substances outside the legitimate practice of medicine.  It was because Hoffer was
> a physician, and was entrusted as a physician with prescription writing authority,
> that he was able to commit the crimes for which he was convicted.

129 F.3d at 1204.

Vigil here abused society's trust by using her prescription writing privilege to distribute the controlled substance oxycodone outside the legitimate practice of medicine.  As both United

States v. McCollister and United States v. Hoffer pointed out, it is because Vigil held the position of a nurse practitioner with prescription writing authority that she was able commit the crimes for which she is convicted.  Because Vigil's position of trust as a nurse practitioner with prescription writing authority was thus necessary to the offense's commission, it significantly facilitated the crime under § 3B1.3's abuse-of-trust test's second prong.  The Court therefore concludes that Vigil's conduct in writing false oxycodone prescriptions as a licensed nurse practitioner significantly facilitated the offense's commission.  Vigil thus "abused a position of public trust . . . in a manner that significantly facilitated the commission . . . of the offense," and the USPO therefore correctly applied a 2-level enhancement under § 3B1.2 based upon an abuse of a position of trust.  U.S.S.G. § 3B1.3.

III.    **BECAUSE APPLICATION OF THE § 3B1.3 2-LEVEL ENHANCEMENT IS NOT BASED SOLELY UPON VIGIL'S USE OF A SPECIAL SKILL IN FACILITATING THE OFFENSE'S COMMISSION, THE PSR'S APPLICATION OF BOTH THE § 3B1.1 2-LEVEL ENHANCEMENT FOR VIGIL'S AGGRAVATING ROLE IN THE OFFENSE AND THE 2-LEVEL ENHANCEMENT UNDER § 3B1.3 IS NOT CONTRARY TO THE GUIDELINES.**

Section 3B1.3 prohibits applying a 2-level enhancement in addition to a § 3B1.1 enhancement where the § 3B1.3 "adjustment is based solely on the use of a special skill." U.S.S.G. § 3B1.3.  The Court concludes that § 3B1.3's 2-level enhancement applies to Vigil, because she both used a special skill and "abused a position of public . . . trust" in the offense's commission, by abusing her nurse practitioner prescription writing authority to facilitate writing false oxycodone prescriptions. U.S.S.G. § 3B1.3.  The Court does not find, therefore, that § 3B1.3's "adjustment is based solely on the use of a special skill," but rather that the "adjustment is [also] based upon an abuse of a position of trust, [and § 3B1.3] may [thus] be employed in addition to an adjustment under § 3B1.1 (Aggravating Role)."  U.S.S.G. § 3B1.3. The Court therefore does not agree with Vigil's argument that the "U.S.S.G. expressly prohibits

the double counting of these two enhancements" and overrules Vigil's objection to the PSR's

application of the upward adjustments pursuant to § 3B1.1 and § 3B1.3.

## IV. A PREPONDERANCE OF THE EVIDENCE DOES NOT ESTABLISH THAT VIGIL WAS AN ORGANIZER, LEADER, MANAGER, OR SUPERVISOR IN THE CRIMINAL ACTIVITY FOR WHICH SHE IS CONVICTED, AND THE COURT WILL THEREFORE NOT APPLY AN UPWARD ADJUSTMENT FOR AN AGGRAVATING ROLE UNDER § 3B1.1.

"A two-level adjustment under § 3B1.1(c) applies whenever 'the defendant was an

organizer, leader, manager, or supervisor in any criminal activity [involving less than five

participants and that is not otherwise extensive].'"  United States v. Wardell, 591 F.3d at 1304

(alterations in original)(quoting U.S.S.G. § 3B1.1(c)).   Among the factors a sentencing court

should consider when weighing an aggravating role enhancement are:

> [T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

U.S.S.G. § 3B1.1, cmt. n.4.   The Tenth Circuit has "elaborated that '[i]n considering these

factors, the sentencing court should remain conscious of the fact that the gravamen of this

enhancement is control, organization, and responsibility for the actions of other individuals

because § 3B1.1[] is an enhancement for organizers or leaders, not for important or essential

figures.'"  United States v. Sallis, 533 F.3d at 1223 (quoting United States v. Torres, 53 F.3d at

1142).  "Functioning as a leader requires an element of control over underlings, particularly in

the form of recruitment and direction.  To qualify as an organizer, however, no control is

necessary."  United States v. Wardell, 591 F.3d at 1304 (citations omitted)(citing United States

v. Cruz Camacho, 137 F.3d at 1224-25; United States v. Egbert, 563 F.3d at 1103).  "As a result,

a defendant may be punished as an organizer under § 3B1.1(c) for devising a criminal scheme, providing the wherewithal to accomplish the criminal objective, and coordinating and overseeing the implementation of the conspiracy even though the defendant may not have any hierarchical control over the other participants." United States v. Valdez-Arieta, 127 F.3d at 1272.  Thus, "'[t]he key to determining whether a defendant qualifies as an organizer is not direct control but relative responsibility.'" United States v. Wardell, 591 F.3d at 1304 (quoting United States v. Tejada-Beltran, 50 F.3d 105, 112 (1st Cir. 1995)).

        The undisputed facts here, and the facts that the Court is willing to find by a preponderance of the evidence, do not support finding that Vigil was an organizer, leader, manager, or supervisor in the criminal activity, but rather that she was an essential figure to the criminal activity, as it was her license to prescribe controlled substances which allowed the crime's commission.  The Tenth Circuit's instruction that "the sentencing court should remain conscious . . . [that] § 3B1.1[] is an enhancement for organizers or leaders, not for important or essential figures,'" is thus important here.   United States v. Sallis, 533 F.3d at 1223 (emphasis added).  Here, Vigil's co-Defendants, Gray, Ortega, and Montano, would come to Clinica de la Gloria and ask her for illegitimate prescriptions and pay her upfront for the illegitimate prescriptions.  On the one hand, there are facts that indicate some level of leadership or managerial role, given that Vigil owned and operated Clinica de la Gloria, and that she would falsify the patients' medical charts with phantom symptoms which the drugs prescribed would address.  These facts might have provided support for the United States' contention that Vigil is a leader, organizer, manager, or supervisor of a criminal organization if she had conceived of and opened Clinica de la Gloria for the purpose of dispensing illegitimate drug prescriptions, or if she had had multiple nurse practitioners working for her at Clinica de la Gloria and had gone into

their patients' charts to write up phantom systems in furtherance of the drug-trafficking organization. Those scenarios are not, however, present here. Rather, the narrative here is that Vigil's co-Defendants and perhaps other patients would come to her at Clinica de la Gloria, these non-employees would ask for illegitimate prescriptions for controlled substances, Vigil would acquiesce and write the prescription, and she was rewarded with cash, as would any other street drug dealer.

The Court does not mean to in any way degrade the seriousness of Vigil's offense. The Court believes that Vigil deserves more punishment that most drug dealers; as a medical professional licensed to prescribe controlled substances, the community provided her with considerable trust, and with that trust comes responsibility. The Commission and the Court have, however, considered that factor and punished her accordingly: the Commission by providing a 2-level upward adjustment for abusing a position of trust in § 3B1.3 and the Court by applying the 2-level adjustment to Vigil. Moreover, given the national problem with prescription drug abuse, see, e.g., Timothy W. Martin, Painkiller Abuse Hits New States, The Wall Street J., Mar. 11, 2013, at A2, (discussing the extent to which "[t]he epidemic in painkiller-abuse gripping the Southern and Eastern U.S. is tightening its hold on the Western part of the country"), and the problem in New Mexico particularly, see Dan Frosch, Prescription Drug Overdoses Plague New Mexico, N.Y. Times, June 9, 2012, A10 (stating that "a new affliction has hammered New Mexico: prescription drug overdoses," and noting that a New Mexico Department of Health report released in May, 2012, "found that the drug overdose death rate in New Mexico jumped more than 60 percent between 2001 and 2010"), there is no question that dealing prescription drugs is a serious offense.

The Sentencing Commission did not intend specifically to punish drug dealers in § 3B1.1, as it does so in § 2D1.1 -- where the seriousness of the particular drug involved in the offense is taken into consideration vis-à-vis the drug equivalency tables -- but rather intended to punish leaders, organizers, managers, and supervisors in the criminal population generally. See United States v. Moore 919 F.2d 1471, 1477 (10th Cir. 1990)(noting that "we have held that the mere sale of drugs to a customer does not prove the defendant's status as a supervisor or leader under § 3B1.1," and holding that § 3B1.1's enhancement was erroneously applied to a cocaine dealer, who dealt drugs to individuals "who chose to personally use the drug or to resell it, without interference from [the defendant]" (citing United States v. Reid, 911 F.2d 1456, 1465 (10th Cir. 1990), abrogated on other grounds as recognized in United States v. Cruz Camacho, 137 F.3d 1220, 1224 n.3 (10th Cir. 1998)); United States v. Mays, 902 F.2d 1501, 1503 (10th Cir. 1990))).  The evidence here does not support finding that Vigil managed or organized any drug organization; it only suggests that she played a role more on the level of a drug dealer in providing prescriptions of drugs to individuals who asked and paid her for the prescriptions.  The Court, therefore, concludes that she was not a "organizer, leader, manager, or supervisor in any criminal activity," and therefore sustains her objection to the PSR's application of the 2-level upward adjustment under U.S.S.G. § 3B1.1.

The Court starts with a base offense level of 30 based on the drug equivalency tables contained in U.S.S.G. § 2D1.1, and the parties' agreement that "the equivalent of at least 700 kilograms but less than 1,000 kilograms of marijuana is attributable to the defendant."  PSR ¶ 46, at 14.  Applying a 2-level upward adjustment under U.S.S.G. § 3B1.3 based on Vigil's "abuse of position of trust or use of special skill" in the offense, PSR ¶ 50, at 14-15, brings the offense level to 32.  With the 3-level reduction under U.S.S.G. § 3E1.1 based on Vigil's acceptance of

responsibility, see PSR ¶ 53, at 15, her total offense level comes to 29.  An offense level of 29 and a criminal history category of I results in a Guideline imprisonment range of 87 to 108 months.

## V.     THE COURT WILL VARY DOWNWARD TO A SENTENCE OF 41 MONTHS.

After sustaining Vigil's objection to the aggravated role adjustment, the offense level is 29 and the criminal history category is I.  The Guideline imprisonment range is 87 to 108 months.  The Court notes Vigil, a nurse practitioner, wrote prescriptions for oxycodone and conspired with the co-Defendants to distribute them.   Vigil also wrote prescriptions for oxycodone under various names; they were written outside the scope of her medical practice and without a legitimate medical justification.

At the hearing, Court discussed twelve factors exerting downward pressure on Vigil's sentence.  See Tr. at 69:11-12 (Court).  They were as follows: (i) her physical condition; (ii) her difficult childhood; (iii) her chronic depression; (iv) her dedication to serving the underprivileged, as discussed in letters which the Court received; (v) her depression made her vulnerable to suggestion by others that she become involved in this conspiracy; (vi) that many of her professional relationships had been damaged, and she had already lost her professional license and reputation because of this case; (vii) she is impoverished and disabled; (viii) the crime went on longer because she was emotionally unable to remove herself from the conspiracy; (ix) she accepted responsibility for her actions and was cooperative; (x) given her age and that she lost her license, additional prison time would not provide any greater deterrence to prevent her from repeating the crime; (xi) the Court could impose conditions of supervised release that would help her with her mental health problems, which would put her under the federal court's supervision until she was in her mid-sixties; and (xii) the disparity between the

- 56 -

Guidelines range for Vigil and the sentences received by her co-Defendants. See Tr. at 69:12-74:8 (Court). Four factors, however, counsel against varying from the Guidelines: (i) a concern about deterring those in the community who would commit the same crime; (ii) sentencing parity between Vigil, a medical professional who abused her trust to deal drugs and the broader mass of drug dealers in the community; (iii) prescription drugs are a serious problem in New Mexico, and Albuquerque in particular, Vigil's actions in exacerbating the drug problem were significant; (iv) and the overall seriousness of the crime.

In the Court's view, these factors justified varying downward the equivalent of about seven offense levels from a sentence equal to an offense level 29 to a sentence more in line with that given for an offense level 22, which would provide a Guidelines range of 41-51 months of imprisonment. Having considered the sentencing range established by the Guidelines, the Court believes that a sentence of 41 months is sufficiently high to reflect the seriousness of the offense and promote respect for the law, but that it is a more just sentence than the Guidelines sentence. It concludes that the sentence affords adequate deterrence, both specific and general; Vigil is unlikely to reoffend, at least as to this crime, and while this is a considerable variance, the sentence is still long enough to deter most people -- particularly professionals -- who might be tempted to engage in similar crime. Vigil's dire situation makes it less necessary for the sentence to protect the public because she is likely not to reoffend and avoids unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, specifically the co-defendants here, and also, with other drug dealers and other people engaged in drug trafficking in the community. Further, the Court will impose some conditions as part of supervised release which effectively provides the defendant with needed education, training, and care to help her with her problem and to keep this situation from

recurring.  The Court concludes a sentence of 41 months fully and effectively reflects each of the factors embodied in 18 U.S.C. § 3553(a).

While the Court's task as a district judge is not to come up with reasonable sentences, but to balance 18 U.S.C. § 3553(a) factors correctly, see United States v. Conlan, 500 F.3d 1167, 1169 (10th Cir. 2007)("[A] district court's job is not to impose a reasonable sentence.  Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2)." (citation omitted)), the Court believes that this sentence better balances the factors in 18 U.S.C. § 3553(a) than the Guidelines range and is reasonable, and concludes that it is more reasonable than the bottom of the Guidelines range. Further, the Court believes it better reflects the factors in 18 U.S.C. § 3553(a) than the Guidelines range.  Perhaps most importantly, the Court concludes that this sentence is sufficient without being greater than is necessary to comply with the purposes of punishment set forth in the Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1987 (codified as amended in scattered sections of 18 U.S.C.).

Accordingly, as to Count 1 of Indictment CR 10-2310-001JB, Vigil is committed to the custody of the Bureau of Prisons for a term of 41 months.  Vigil is placed on supervised release for a term of three years.  Vigil must comply with the standard conditions of supervised release and the following mandatory conditions: (i) she will submit to DNA collection in compliance with statutory requirements while incarcerated in the Bureau of Prisons or at the direction of the USPO; and (ii) she shall not possess, have under her control, or have access to any firearm ammunition, explosive device, or other dangerous weapons as defined by federal state or local law.

The following special conditions will also be imposed: (i) Vigil must submit to a search of her person, property, or automobile at her control to be conducted in a reasonable manner and at a reasonable time for the purpose of detecting weapons, illegal substances, and any illegal contraband at the direction of the probation officer; she must inform any residents that the premises may be subject to a search; this special condition is imposed as she wrote illegal prescriptions and sold them for a profit; this condition is further imposed assuring her compliance with the mandatory condition that she not possess or use any illegal substances or any illegal contraband; (ii) Vigil must participate in and successfully complete an outpatient mental health treatment program as approved by the probation officer; she may be required to pay a portion of the cost of this treatment determined by the probation officer; this special condition is imposed based on Vigil's longstanding history with depression and diagnosis of post-traumatic and major depressive disorder; it is further imposed to allow her to receive treatment to treat her post-traumatic stress disorder and depression; (iii) Vigil will be prohibited from incurring new credit charges, opening new lines of credit, or negotiating or consummating any financial contracts without prior approval of the United States; this special condition is imposed because she admits that she sold prescriptions for money to pay her bills and because of the number of outstanding debts she has incurred; (iv) Vigil must provide the probation officer access to any requested financial information, personal income tax returns, authorization for release of credit information, and other business financial information in which Vigil has a control or interest; this condition is imposed because Vigil admitted she sold prescriptions because she was having financial troubles; (v) Vigil shall have no contact with the co-Defendants in this case; this special condition is imposed to prevent Vigil from engaging in further criminal activities; (vi) Vigil is restricted from engaging in an occupation where she would have access to

prescription medications or have the ability to disseminate prescription medications; this special condition is imposed because Vigil was a nurse practitioner, and she misused both her nursing license and her prescription privileges in this federal offense for which she is being sentenced; and (vii) Vigil shall cooperate and arrange with the Internal Revenue Service to pay all taxes, past and present, including any interest and penalties owed; Vigil shall file timely accurate and lawful income tax returns and show proof to the probation officer; this special condition is imposed as the defendant has state and federal tax liens.

Based on Vigil's lack of financial resources, the Court will not impose a fine.  Vigil will pay a special assessment of $100.00, which is due immediately.

**IT IS ORDERED** that the objections in Defendant Vigil's Objections to the Presentence Report & Sentencing Memorandum, filed March 16, 2012 (Doc. 122) are sustained in part and overruled in part.  The Court overrules Defendant Gloria Vigil's objections to paragraphs 7 and 8 of the PSR as moot.  The Court overrules Vigil's objections to paragraphs 24 and 25, in light of the parties' agreement to modify paragraph 24 of the PSR by noting that

> Vigil contends that she did not provide Montano with names or prescriptions on May 12th or 13th, 2010, nor communicated with Montano about where to meet to obtain prescriptions.  Montano's telephone records do not support his assertion that he would call Vigil with the name he wanted to use and she would tell him where they were going to meet.

The Court overrules Vigil's objections to paragraph 40, in light of the parties' agreement to add to the PSR the fact that Ortega and Grey would also use money collected from the sale of prescription drugs to pay their bills.  The Court overrules Vigil's objections to paragraphs 49 and 50 of the PSR, to the extent that her objections rely on the argument that the Court may apply either the aggravating-role enhancement under U.S.S.G. § 3B1.1 or the abuse-of-position-of-trust enhancement U.S.S.G. § 3B1.3, but may not apply both enhancements.  The Court sustains

Vigil's objection to the aggravating-role enhancement.  The Court denies Vigil's request for a downward departure for physical condition under U.S.S.G. §§ 5H1.3 and 5H1.4.  The Court will vary downward, but will not vary downward as much as Vigil requested.  The Court will, instead, vary downward the equivalent of approximately seven offense levels from a sentence equal to an offense level 29 to a sentence similar to that given for an offense level 22, which would provide a Guidelines range of 41-51 months of imprisonment.  The Court sentences Vigil to 41-months imprisonment.

_____
UNITED STATES DISTRICT COURT

*Counsel:*

Kenneth J.  Gonzales
  United States Attorney
John C. Anderson
  Assistant United States Attorney
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Marc M. Lowry
Rothstein, Donatelli, Hughes, Dahlstrom & Schoenburg, LLP
Albuquerque, New Mexico

     *Attorneys for the Defendant*